**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Mdewakanton Sioux Indians of Minnesota
1960 Larson Lane
Welch, MN 55089

Civil Action No. ______________

Margo Bellanger
1960 Larson Lane
Welch, MN 55089

Tina Jefferson
1754 Edoka Street
Welch, MN 55089

Michael J. Childs, Jr.
16501 235th Street Way
Welch, MN 55089

Plaintiffs,

v.

Sally Jewell in her official capacity as
Secretary of the U.S. Department of the
Interior, or her successor, U.S.
Department of the Interior
1849 C Street NW
Washington, D.C. 20240

United States
Service to: U.S. Department of Justice
U.S. Attorney General
950 Pennsylvania Avenue NW
Washington, D.C. 20530

Defendants.

---

**VERIFIED COMPLAINT**

---

The Mdewakanton Sioux Indians of Minnesota, Margo Bellanger, Tina Jefferson, and Michael J. Childs, Jr. for their complaint alleges as follows:

## INTRODUCTION

The Mdewakanton Sioux Indians of Minnesota ("MSIM") is an American Indian tribe or band of lineal descendants that have not been terminated by any act of Congress, but was acknowledged to exist by the United States in 1934 as being under federal jurisdiction. The MSIM has a decentralized organizational structure along family lines, meeting annually or more frequently, and maintains a list of eligible lineal descendants. It can sue the United States for MSIM land or benefits, or both, or otherwise seek possible organization under the Indian Reorganization Act if more reservation land becomes available. However, recently, the United States refuses to acknowledge the MSIM.

Here, the MSIM sues the United States to acknowledge MSIM's existence and to enjoin the United States from continuing arbitrary decisions without informing the MSIM that have the consequence of adversely affecting the rights or potential rights of the MSIM.

## JURISDICTION

1. Jurisdiction is founded upon 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1362, 28 U.S.C. § 2201, and 5 U.S.C. §§ 701-708.

2. Specifically, under the Administrative Procedures Act claim, 5 U.S.C. § 702, a person may sue for a legal wrong against the United States:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

3. The APA claim under 5 U.S.C. § 702 applies because the Mdewakanton Sioux Indians of Minnesota are suffering legal wrongs due to the Defendant Department of the Interior's actions and because the Mdewakanton Sioux Indians of Minnesota are adversely affected and aggrieved by the agency's action within the meaning of the applicable statutes and are, therefore, the Mdewakanton Sioux Indians of Minnesota is entitled to judicial review.

4. 5 U.S.C. § 702 applies because the Defendants acted or failed to act in an official capacity or under color of legal authority through their policies, practices, and customs in violating the Mdewakanton Sioux Indians of Minnesota's legal rights and entitlements under federal statutes.

5. Under 25 U.S.C. § 5121, the Indian Reorganization Act of 1934, recodified, states "Nothing in this Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States."

6. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e) because at least one defendant resides within the District of Columbia and a substantial part of the events or omissions giving rise to the claims herein occurred in the District of Columbia.

## PARTIES

**Plaintiff Mdewakanton Sioux Indians of Minnesota is an acknowledged band of Indians which has not been terminated as a band by an act of Congress.**

7. In 1863, the United States acknowledged by a Congressional Act that it "became bound by treaty stipulations to the Sisseton, Wahpaton, Medawakanton, and Wahpakoota bands of the Dakota or Sioux Indians to pay large sums of money and annuities…." Act of Feb. 16, 1863, Ch. 37, 12 Stat. 652.

8. The Act of February 16, 1863, Ch. 37, 12 Stat. 652 has not been repealed.

9. Under the Act of February 16, 1863, Ch. 37, 12 Stat. 652, the United States abrogated and annulled all treaties with the bands of the Sisseton, Wahpaton, Mdewakanton, and Wahpakoota Indians: "That all treaties heretofore made and entered into by the Sisseton, Wahpaton,

Medwakanton, and Wahpakoota Bands of Sioux or Dakota Indians, or any of them, with the United States, are declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States …."

10. The Act of February 16, 1863, Ch. 37, 12 Stat. 652 did not terminate the Sisseton, Wahpaton, Mdewakanton, and Wahpakoota as tribes or bands of Sioux or Dakota Indians.

11. There is no Act of Congress which has terminated the Sisseton, Wahpaton, Mdewakanton, and Wahpakoota as tribes or bands of Sioux or Dakota Indians, including members of those bands that remained in Minnesota who had "exerted himself in rescuing the whites from the late massacre of said Indians" that had occurred in 1862. Act of February 16, 1863, Ch. 37, § 9, 12 Stat. 652.

12. The Plaintiff Mdewakanton Sioux Indians of Minnesota ("MSIM") consists of those American Indians and lineal descendants who remained or returned to Minnesota in or about 1863 whom Congress identified as a band of Indians as reflected in the Act of February 1863.

13. The MSIM has a decentralized organizational structure along family lines, meeting annually or more frequently, and maintains a list of eligible lineal descendants.

14. Additional references to this band of Indians are found in the Congressional 1888-1890 Appropriation Acts and the 1980 Act. The three "1888-1890 Appropriation Acts" refers to the Act of June 29, 1888, ch. 503, 25 Stat. 217, 228–29; the Act of Mar. 2, 1889, ch. 412, 25 Stat. 980, 992–93; and the Act of Aug. 19, 1890, ch. 807, 26 Stat. 336, 349. The "1980 Act" refers to Act of Dec. 19, 1980, Pub. L. 9-557, 94 Stat. 326.

15. There is no Congressional Act that terminated federal jurisdiction over the Mdewakanton Sioux Indians of Minnesota band.

16. The Mdewakanton Sioux Indian of Minnesota band existed and was under federal jurisdiction on June 18, 1934, the day the Indian Reorganization Act was enacted.

17. Plaintiff Margo Bellanger is an Mdewakanton Sioux Indian of Minnesota because she is a lineal descendant of the following persons on the attached 1886-1889 census of the Mdewakanton Sioux Indian of Minnesota: Jacob Otherday; Tamara (Martha) Otherday; Emma Otherday; Joseph Benjamin Campbell; Thomas Whipple; Anna Whipple; Thomas Whipple (son) and Lena Whipple Campbell. **Exhibit Q.**

18. Margo Bellanger is also a member of Prairie Island Indian Community in the State of Minnesota.

19. Plaintiff Tina Jefferson is an Mdewakanton Sioux Indian of Minnesota because she is a lineal descendant of the following persons on the

attached 1886-1889 census of the Mdewakanton Sioux Indian of Minnesota: Jacob Otherday; Tamara (Martha) Otherday; Emma Otherday; Joseph Benjamin Campbell; Thomas Whipple; Anna Whipple; Thomas Whipple (son) and Lena Whipple Campbell.

20. Tina Jefferson is also a member of Prairie Island Indian Community in the State of Minnesota.

21. Plaintiff Michael J. Childs, Jr. is an Mdewakanton Sioux Indian of Minnesota because he is a lineal descendant of the following persons on the attached 1886-1889 census of the Mdewakanton Sioux Indian of Minnesota: Jacob Otherday; Tamara (Martha) Otherday; Emma Otherday; Joseph Benjamin Campbell; Thomas Whipple; Anna Whipple; Thomas Whipple (son) and Lena Whipple Campbell.

22. Michael J. Childs, Jr. is also a member of Prairie Island Indian Community in the State of Minnesota.

23. There are other lineal descendants of Jacob Otherday, Tamara (Martha) Otherday, Emma Otherday, Joseph Benjamin Campbell, Thomas Whipple, Anna Whipple, Thomas Whipple (son) and Lena Whipple Campbell.

24. Many other people self-identify as Mdewakanton Sioux Indian of Minnesota because of lineal descent. **Exhibit A**.

**The Defendants are the Secretary of the Interior, the Department of the Interior and the United States**

25. The Defendants are Secretary of the Interior Sally Jewell, the Department of the Interior, and the United States.

26. The Defendants acted or failed to act in an official capacity or under color of legal authority through their policies, practices, and customs in violating the Mdewakanton Sioux Indians of Minnesota's legal rights and entitlements under federal law.

## STATEMENT OF FACTS

**Congress has never terminated the Mdewakanton Sioux Indian of Minnesota band.**

27. The Mdewakanton Sioux Indian of Minnesota band existed and was under federal jurisdiction on June 18, 1934, the day the Indian Reorganization Act was enacted.

28. In 1863, the United States acknowledged by a Congressional Act that it "became bound by treaty stipulations to the Sisseton, Wahpaton, Medawakanton, and Wahpakoota bands of the Dakota or Sioux Indians to pay large sums of money and annuities…." Act of Feb. 16, 1863, Ch.37, 12 Stat. 652.

29. The Act of February 16, 1863, Ch. 37, 12 Stat. 652 has not been repealed.

30. Under the Act of February 16, 1863, Ch. 37, 12 Stat. 652, the United States abrogated and annulled all treaties with the bands of the Sisseton, Wahpaton, Mdewakanton, and Wahpakoota Indians: "That all treaties heretofore made and entered into by the Sisseton, Wahpaton, Medwakanton, and Wahpakoota Bands of Sioux or Dakota Indians, or any of them, with the United States, are declared to be abrogated and annulled, so far as said treaties or any of them purport to impose any future obligation on the United States …."

31. The Act of February 16, 1863, Ch. 37, 12 Stat. 652 did not terminate the Sisseton, Wahpaton, Mdewakanton, and Wahpakoota as tribes or bands of Sioux or Dakota Indians.

32. There is no Act of Congress that has terminated the Sisseton, Wahpaton, Mdewakanton, and Wahpakoota as tribes or bands of Sioux or Dakota Indians, including members of those bands that remained in Minnesota who had "exerted [themselves] in rescuing the whites from the late massacre of said Indians" that had occurred in 1862. Act of February 16, 1863, Ch. 37, § 9, 12 Stat. 652.

33. The MSIM consists of those American Indians and lineal descendants who remained or returned to Minnesota in or about 1863 whom Congress identified as bands of Indians as reflected in the Act of February 1863.

34. Later, under the Appropriation Acts, the United States purchased lands in Minnesota at localities known as Lower Sioux, Prairie Island and Shakopee. For example, the Appropriation Act of June 29,1888, 25 Stat. at 228 stated

> "For the support of the full-blood Indians in Minnesota, belonging to the Medawakanton ban of Sioux Indians, who have resided in said State since the twentieth day of May, A.D. eighteen hundred and eighty-six, and severed their tribal relations …to be expended by the Secretary of the Interior in the purchase … of …lands,"

35. The lands were assigned to Mdewakanton Sioux Indians under rules and regulations issued by the Secretary of the Interior.

36. Notably, there were insufficient lands to accommodate or otherwise assign to all members of the Mdewakanton Sioux Indians of Minnesota.

37. According to an April 1934 census of Mdewakanton Sioux Indians of Minnesota then under Pipestone School jurisdiction, not all members of the band were located at Lower Sioux, Prairie Island and Shakopee. **Exhibit B.**

38. Those Mdewakanton Sioux Indians of Minnesota who did not reside or have land assignments in the localities at Lower Sioux, Prairie Island and Shakopee did not severe tribal relations as required under the Appropriation Acts.

39. The MSIM band was under the Pipestone School jurisdiction, which included, but not exclusively, three groups located at Lower Sioux, Prairie Island and Shakopee on lands appropriated under the Appropriation Acts. **Exhibit B.** As a whole, including the three groups, they voted and accepted the provisions of the Indian Reorganization Act of June 18, 1934, 48 Stat. 984. Eventually, Prairie Island and Lower Sioux communities were given articles of incorporation and constitutions in 1936.

40. Again, not all MSIM band members were part of those groups who were located on lands found at Lower Sioux, Prairie Island and Shakopee and as such, did not severe tribal relations. Further, there were insufficient lands to accommodate all MSIM band members to reside on those reservations.

41. Regardless, those who resided on the reservation lands obtained by the United States through the Appropriation Acts, had to severe tribal relations to organize under the IRA.

42. Because the Indians located at Lower Sioux and Prairie Island had severed tribal relations, they were not privileged to organize as a tribe over those reservation lands.

43. Their only basis of organization was as Indians residing on a reservation. In short, severance of tribal relations ran with the land.

44. Therefore, those Indians residing on reservation lands at Prairie Island and Lower Sioux, organized as separate communities under the provisions of the Indian Reorganization Act. Eventually, in 1936, both communities would receive articles of incorporation and a constitution.

45. The Prairie Island and Lower Sioux Constitutions also provided for an annual conference of the whole Mdewakanton Sioux Indians of Minnesota on matters of common interest, including these separate communities organized under the IRA.

**Only Congress can terminate Indian tribes and the Mdewakanton Sioux Indians of Minnesota were not one of those tribes terminated.**

46. Only Congress can terminate Indian tribes.

47. Tribal termination was a policy of the United States during the 1940s into the 1960s. Congress, during this period, did terminate tribes.

48. Congress has not passed an act that terminated the Mdewakanton Sioux Indians of Minnesota.

49. The Indian Reorganization Act (IRA), enacted on June 18, 1934, was a watershed legal event causing the Department of the Interior to make many administrative actions and determinations regarding all American Indian groups nationwide. Act of June 18, 1934, ch. 576, 48 Stat. 984 (also known as the Wheeler–Howard Act) (codified as amended at 25 U.S.C. §§ 461–79).

50. The Department of the Interior correspondence in 1935 interpreted the IRA to recognize the Mdewakanton Sioux Indians of Minnesota and their reservations in Minnesota under the IRA. Those documents are attached as **Exhibits C and D**.

51. In October of 1935, the Mdewakanton Sioux Indians of Minnesota proposed a tribal constitution under the Indian Reorganization Act with jurisdiction over the lands at Prairie Island, Lower Sioux and Shakopee.

52. On November 27, 1935, Bureau of Indian Affairs Commissioner John Collier acknowledged that the Mdewakanton Sioux Indians of Minnesota as under federal jurisdiction. However, the reservation's communities would be non-tribal because of statutory provision severing tribal relations running with the land:

> These Indians cannot be recognized as a tribe. The statutes providing for such land purchased for these Indians expressly restricted the use of such lands to Indians who have abandoned their tribal relations. These Indians, furthermore, have no tribal funds. The basis of organization, therefore for these Indians is residence on reservation land…In view, however, of the fact these are restricted lands upon which these Indians are now living, it would appear possible to recognize the Mdewakanton Sioux either as one group with jurisdiction over all of the five or six localities or as five or six groups each with jurisdiction over the land and only one community. It is believed this is largely an administrative question which should be decided in the field on the basis of past administrative practices and further land

> acquisition plans. There appears to be legal basis for either form of organization.

**Exhibit C.**

53. Assistant Solicitor Charlotte T. Westwood and Chief of Miscellaneous Section J.R. Venning, at the time, confirmed the legal acknowledgement that the Mdewakanton Sioux Indians of Minnesota was under federal jurisdiction. However, the reservation's communities would be non-tribal due to statutory severance of tribal relations provisions running with the land:

> The constitution submitted in October for the Mdewakanton Sioux proposed a single organization of all the Mdewakanton Sioux Communities. On the legal side, however, it was subsequently determined by the Solicitor (see office memoranda above referred to) that these Indians had under the land purchase acts abandoned tribal relations and therefore were not privileged to organize as a tribe over various reservations. Their only basis of organization was as Indians residing on a reservation.

**Exhibit D**.

54. The Mdewakanton Sioux Indians of Minnesota was acknowledged by the Department of the Interior as an existing American Indian group with reservation lands in Minnesota on June 18, 1934 under federal jurisdiction for purposes of the Indian Reorganization Act. **Exhibits C and D**.

55. However, the Department of the Interior administratively determined in 1935 that the reservation's communities could not organize as a tribe under the Indian Reorganization Act – only as communities of non-tribal Indians residing on a reservation – because of the Department's interpretation of the "severance of tribal relations" in the 1888-1890 appropriation acts as running with the land.

56. The Department of the Interior's Solicitor Opinion dated April 15, 1938 confirms the IRA organization of the communities is not tribal and does not have tribal powers, but is based on Indians residing on a reservation and is delegated powers by the Secretary of the Interior in accordance with federal law:

> Neither of these two Indian groups constitutes a tribe but each is being organized on the basis of their residence upon reserved land. After careful consideration in the Solicitor's Office it has been determined that under section 16 of the Indian Reorganization Act a group of Indians which is organized on the basis of a reservation and which is not an historical tribe may not have all of the powers enumerated in the Solicitor's opinion on the Powers of Indian Tribes dated October 25, 1934. The group may not have such of those powers as rest upon the sovereign capacity of the tribe but may have those powers which are incidental to its ownership of property and to its carrying on of business, and those which may be delegated by the Secretary of the Interior.

**Exhibit G**. The 1938 Solicitor's Opinion does not analyze the legal status of the Mdewakanton Sioux of Minnesota.

57. Since the communities received powers delegated by the Secretary of the Interior, they are agent-representatives of the Department of the Interior with the MSIM as beneficiary.

58. In summary, upon the reservation lands of the Mdewakanton Sioux Indians of Minnesota, the Prairie Island Indian Community in 1936, the Lower Sioux Indian Community in 1936 and the Shakopee Mdewakanton Sioux Community in 1969 were organized under the Indian Reorganization Act as non-tribal Indians residing on reservation land, without tribal powers and as agent-representatives of the Department of the Interior.

59. The three Department of Interior-approved Constitutions for the three non-tribal communities based on "Indians residing on reservation land" reflect that the MSIM are the larger group upon which the legal identity of the three communities rely.

60. The MSIM has identified over 7,000 eligible MSIM lineal descendants. **Exhibit A**. A majority of those eligible are not members of the three communities.

61. The Constitution of Prairie Island Indian Community approved in 1936 is attached as **Exhibit E**. The Prairie Island Indian Community

Constitution contains multiple references to the MSIM including annual meetings and a land assignment system.

62. The Constitution of Lower Sioux Indian Community approved in 1936 is attached as **Exhibit F**. The Lower Sioux Indian Community Constitution contains multiple references to the MSIM including annual meetings and a land assignment system.

63. The "residing on same reservation" language in the IRA was repealed in 1988 with a savings clause for pre-existing non-tribal community constitutions.

64. Specifically, Public Law 100-581, title I, Sec. 101, Nov. 1, 1988, 102 Stat. 2938 deleted from section 16 the "residing on same reservation" text, but had a savings clause at Sec. 103: "Nothing in this Act is intended to avoid, revoke or affect any tribal constitution, bylaw or amendment ratified and approved prior to this Act."

65. 25 U.S.C. 5123 (f) and (g), 1994 amendments to the Indian Reorganization Act, provide that the Department of the Interior can no longer enforce "non-tribal" and other designations against federally-recognized Indian tribes:

> (f) Privileges and immunities of Indian tribes; prohibition on new regulations
>
> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act

of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

(g) Privileges and immunities of Indian tribes; existing regulations

Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

66. Under paragraphs (f) and (g), the Department regulations, administrative decisions or determinations made in 1935, or before or since 1935, regarding the reservation's communities being non-tribal because of interpreting the 1888-1890 Appropriation Acts severance of tribal relations as running with land have "no force or effect."

67. Under paragraphs (f) and (g), the Department in future regulations, administrative decisions or determinations must regard the reservations' communities as tribal under the Indian Reorganization Act – notwithstanding any text in the 1888-1890 Appropriation Acts suggesting non-tribal.

68. However, the Department's policies, practices and customs err when they use paragraphs (f) and (g) as a legal basis to treat the three communities which were organized as "non-tribal Indians on a reservation"

as three separate sovereign tribes resulting in the MSIM and MSIM's concomitant rights being terminated without a statute.

69. The Indian Reorganization Act has three "savings" provisions preserving tribal status of the MSIM against a too robust application of paragraph (f) and (g) upon the federally-recognized communities to the point that the MSIM and its concomitant rights are terminated.

70. First, 25 U.S.C. § 5123(h), immediately following paragraphs (f) and (g) states itself that, notwithstanding any provision in the IRA that a tribe such as MSIM retains its inherent sovereign powers:

> (H) TRIBAL SOVEREIGNTY
> Notwithstanding any other provision of this Act—
> (1) each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section; and
> (2) nothing in this Act invalidates any constitution or other governing document adopted by an Indian tribe after June 18, 1934, in accordance with the authority described in paragraph (1).

71. Second, 25 U.S.C. §5121 states that nothingwithstanding any provision in the IRA that no claim or suit of an Indian tribe or its rights are impaired:

> Claims or suits of Indian tribes against United States; rights unimpaired
>
> Nothing in this Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States. It is declared to be the intent of Congress that no expenditures for the benefit of Indians

> made out of appropriations authorized by said sections shall be considered as offsets in any suit brought to recover upon any claim of such Indians against the United States.

72. Third, 25 U.S.C. §5128 expressly preserves all laws, general and specific, concerning reservation land as continuing after the IRA, which would include those statutes which create rights and entitlements for the MSIM:

> Application of laws and treaties
>
> All laws, general and special, and all treaty provisions affecting any Indian reservation which has voted or may vote to exclude itself from the application of the Act of June 18, 1934 (48 Stat. 984) [25 U.S.C. 5101 et seq.], shall be deemed to have been continuously effective as to such reservation, notwithstanding the passage of said Act of June 18, 1934. Nothing in the Act of June 18, 1934, shall be construed to abrogate or impair any rights guaranteed under any existing treaty with any Indian tribe, where such tribe voted not to exclude itself from the application of said Act.

73. Federally-acknowledged American Indian groups, tribal and non-tribal, cannot be legally terminated without statutory termination.

74. No federal statute supports the Department's present policies, customs and practices treating the MSIM, a federally-acknowledged Indian tribe, as legally terminated without statutory termination.

75. The MSIM has a federally-acknowledged legal identity as a "tribe" under the Indian Reorganization Act separate and apart from the three communities – which the Court should affirm in this lawsuit.

**The Department of the Interior's policies, customs and practices fail to recognize MSIM's legal identity as a "tribe" under the Indian Reorganization Act separate and apart from the three communities.**

76. The Department of the Interior's policies, customs and practices fail to recognize MSIM's legal identity as a "tribe" under the Indian Reorganization Act separate and apart from the three communities – acting as if the MSIM and its concomitant rights are terminated.

77. The Department of the Interior under newly established agency rules, Federal Register, Vol. 80, No. 201, p. 63094, is considering approving a Secretarial Election for Prairie Island Indian Community in the State of Minnesota to amend its constitution to eliminate all references to the Mdewakanton Sioux Indians of Minnesota.

78. A copy of the newly established rules is attached as **Exhibit H**.

79. A copy of the new proposed constitution for Prairie Island Indian Community as **Exhibit I**.

80. Under the newly-adopted Department of the Interior rules, the Department of the Interior does not consult with the Mdewakanton Sioux Indians of Minnesota about termination of their rights, including the termination of the federal land assignment system and the annual meetings for the Mdewakanton Sioux Indians of Minnesota, but only consults with the communities.

81. The Plaintiff representatives have attempted to communicate with the Department of the Interior on these matters; in response, the Department has directed the Plaintiff to communicate only with the community.

82. More than one federal court decision has recognized that the Department of the Interior has dealt in a convoluted or complicated way with the Mdewakanton Sioux Indians of Minnesota who have been provided with land under the 1863 Act, the 1888-1890 Appropriation Acts and the 1980 Act.

83. The Plaintiff representatives Margo Bellanger, Tina Jefferson, Michael J. Childs, Jr. – all members of the Prairie Island Indian Community -- are lineal descendants of the Mdewakanton Sioux Indian of Minnesota, recognized under the Indian Reorganization Act and are statutory beneficiaries of the 1863 Act, the 1888-1890 Appropriation Acts and the 1980 Act.

84. Under Section 9 of the 1863 Act, the Secretary of the Interior in 1865 set apart 12 square miles of land for the Mdewakanton Sioux Indian of Minnesota which were statutorily to be for them and their lineal descendants "forever."

85. However, the Mdewakanton Sioux Indian of Minnesota were unable to settle there due to local white hostility.

86. Eventually, the 1863 Act lands were wrongly sold by the Department to the public.

**The Department, after Congressional revocation of the Prairie Island Indian Community corporate charter in 1996, must make land assignments to the Mdewakanton Sioux Indians of Minnesota.**

87. The Department, after Congressional revocation of the Prairie Island Indian Community corporate charter in 1996, must make land assignments to the MSIM.

88. Under the 1888, 1889 and 1890 Appropriation Acts, the Secretary of the Interior purchased 1.5 square miles of lands for the same Mdewakanton Sioux Indians of Minnesota.

89. The lands were purchased at Lower Sioux, Shakopee and Prairie Island.

90. The Plaintiff individuals in this lawsuit have a particular interest in lands purchased under the 1888-1890 Appropriations Act at Prairie Island – specifically a 30 acre parcel within those lands which were purchased.

91. The street address of the 30 acre parcel is 6096 Whipple Way, Welch, Minnesota ("6096 Whipple Way").

92. Connie Campbell, spouse of Joseph Whipple Campbell, resided at 6096 Whipple Way until a tribal court order issued March 14, 2016 evicted her from 6096 Whipple Way.

93. The Prairie Island Mdewakanton Dakota Community Tribal Court issued a March 14, 2016 decision *Prairie Island Indian Community v. Connie Campbell,* Court File No. CIV-0904-15 justifying the eviction against Connie Campbell.

94. Joseph Whipple Campbell died on May 23, 2014.

95. 6096 Whipple Way is part of the lands purchased for the benefit of the Mdewakanton Sioux Indian of Minnesota in about 1891 with funds appropriated under the 1888-1890 Appropriation Acts.

96. The 30 acre parcel was described by the Department of the Interior as Lots 75, 76, 77 and 78.

97. On January 15, 1955, Lots 75 and 78 of those lands were assigned to Mrs. Lena Campbell, the mother of Joseph Whipple Campbell.

98. Joseph Whipple Campbell had a home on Lot 78 adjacent to Lena Campbell's assignment – 6096 Whipple Way.

99. The Department of the Interior later cancelled the assignment of Lot 77 to Lena Campbell and also modified assignments 75 and 78 to one-acre tracts in 1967 pursuant to suggestions of the governing body of the Prairie Island Indian Community in the State of Minnesota at that time.

100. On August 22, 1972, Lena Campbell died.

101. After Lena Campbell died, Joseph Whipple Campbell, Lena Campbell's son, continued to live at 6096 Whipple Way, and continued to

occupy Lena Campbell's assigned property until Joseph Whipple Campbell died on May 23, 2014.

102. The Prairie Island Indian Community in the State of Minnesota in *Prairie Island Indian Community v. Connie Campbell,* Court File No. CIV-0904-15, obtained a tribal court order evicting Connie Campbell, the spouse of Joseph Whipple Campbell, from 6096 Whipple Way.

103. From the approximate 1891 purchase of the 1.5 square miles of lands under the 1888-1890 Appropriation Acts until the enactment of the 1980 Act, the Department of the Interior assigned parcels to Mdewakanton Sioux Indian of Minnesota lineal descendants – specifically Otherday/Campbell/Whipple lineal descendants.

104. The 1980 Act, section 1, placed the parcels at Prairie Island in trust for the "Prairie Island Indian Community" which was a corporation established by the Prairie Island Indian Community in the State of Minnesota in 1937.

105. However, section 3 of the 1980 Act preserved the property rights of MSIM assignees:

> Sec. 3. Nothing in this Act shall (1) alter, or require the alteration, of any rights under any contract, lease, or assignment entered into or issued prior to enactment of this Act, or (2) restrict the authorities of the Secretary of the Interior under or with respect to any such contract, lease, or assignment.

106. The Department of the Interior explicitly states in the 1982 Federal Register that the 1980 Act beneficial interest under Section 1 was for the "Prairie Island Indian Community" – the corporation. 47 Fed. Reg. 151 at 34050 states:

> Lands transferred and declared to be part of the reservation of the Prairie Island Indian Community: …

107. The Prairie Island Indian Community in the State of Minnesota is not mentioned in the 47 Fed. Reg. 151 at 34050 – nor in the 1980 Act upon which it is based.

108. According to the list of recognized tribes, the federally-recognized community at the time was called "Prairie Island Indian Sioux Community, Prairie Island Reservation, Minnesota." 44 F.R. 7235.

109. In 1996, Prairie Island residents voted to revoke the charter of the "Prairie Island Indian Community."

110. Congress then enacted the 1996 Act – Act of October 9, 1996, P.L. 104-261, 110 Stat. 3176 -- to accept the revocation of the corporate charter of "Prairie Island Indian Community."

111. The legal consequence of the 1996 Act was dissolution of the corporation "Prairie Island Indian Community."

112. Accordingly, the corporation's beneficial interest under section 1 of the 1980 Act was terminated.

113. Congress made no provision in the 1996 Act to amend the 1980 Act as to that beneficial interest which had been for the corporation "Prairie Island Indian Community."

114. "Prairie Island Indian Community in the State of Minnesota" -- which has been, since 2002, the federally-recognized entity — can point to no statute establishing its beneficial interest over the 6096 Whipple Way.

115. Since the beneficial interest the 1980 Act established for the corporation is terminated by the 1996 Act, the beneficial interest of 6096 Whipple Way now belongs to the Mdewakanton Sioux Indians of Minnesota generally – and should be assigned to the Plaintiff representatives specifically.

116. After the 1996 Act revoking the corporate charter of the Prairie Island Indian Community, the Prairie Island Indian Community in the State of Minnesota, a federally-recognized non-tribal community, has no beneficial interest in the lands described herein.

117. That beneficial interest remains generally with the Mdewakanton Sioux Indians of Minnesota – and regarding the 30 acres should be assigned specifically to the Plaintiff individuals.

118. Since Indian lands were set apart or purchased or held under the 1863 Act, 1888-1890 Appropriation Acts and the 1980 Act, the Defendants have a legal duty to Plaintiff regarding these lands because the Plaintiffs are

statutory beneficiaries of those acts -- Mdewakanton Sioux Indians of Minnesota.

119. The Department of the Interior performed this duty to Plaintiff Mdewakanton Sioux Indians of Minnesota from 1890 through the 1980 Act by making land assignments at Prairie Island, Lower Sioux and Shakopee available to Mdewakanton Sioux Indians of Minnesota and since 1980 by honoring such previously-issued land assignments.

120. Since at least the time of enactment of the 1996 Act, regarding the Prairie Island lands, the Defendants have violated their legal responsibilities to Plaintiff by failing to ensure that new land assignments regarding these lands at Prairie Island are assigned to Mdewakanton Sioux Indian of Minnesota lineal descendants.

121. Specifically, the Defendants have violated their legal duty to Plaintiff by failing to assign 6096 Whipple Way to Mdewakanton Sioux Indian of Minnesota.

122. Instead, since 1996, the Defendants have done nothing to protect the Plaintiff and its rights to 6096 Whipple Way.

**The Department is applying its new rules, adopted on October 19, 2015, to exclude consultation with MSIM regarding its federal rights and entitlements.**

123. Now, the Department of the Interior under newly established agency rules, 80 Federal Register 201 at 63094 (“New Rules”) is considering

approving a Secretarial Election for Prairie Island Indian Community in the State of Minnesota to amend its constitution to eliminate all references to the MSIM and its rights including the federal land assignment system for the Mdewakanton Sioux Indians of Minnesota at Prairie Island Indian Community.

124. Under the New Rules, the Department of the Interior does not consult with the Mdewakanton Sioux Indians of Minnesota prior to the approval of the constitutional amendments affecting the rights of MSIM.

125. The Department of the Interior's policies, practices and customs violate the rights of Mdewakanton Sioux Indians of Minnesota by not consulting directly with it regarding all matters affecting the Mdewakanton Sioux Indians of Minnesota and its rights vis-a-vis Prairie Island Indian Community and the other communities.

**The Community's proposed constitution and bylaws terminate the Mdewakanton Sioux Indians of Minnesota without a Congressional Act.**

126. In February 2016, Mr. Childs received from Prairie Island Indian Community in the State of Minnesota a Notice Regarding Proposed Revisions to Constitution and Bylaws. **Exhibit K**.

127. The proposed revisions to the bylaws and bylaws purport to change the Community's federal legal status under the Indian

Reorganization Act from Mdewakanton Sioux Indians of Minnesota "residing on reservation" status to "tribal" status.

128. The legal consequence of the proposed amendments for the Mdewakanton Sioux Indians of Minnesota and its rights is legal termination under the Indian Reorganization Act.

129. For example, the proposed revisions include the following :

- "This Constitution and Bylaws shall supersede the Constitution and Bylaws of the Prairie Island Indian Community in Minnesota adopted on May 23, 1936 and approved by the Secretary of the Interior on June 20, 1936, as amended." **Exhibit I(1); compare Exhibit I(2)**.
- Changing the name of the "Prairie Island Indian Community in the State of Minnesota" to the "Prairie Island Mdewakanton Dakota Tribe in the State of Minnesota." *Id.*
- Deleting the annual conference of the Mdewakanton Sioux Indian of Minnesota, "To select delegates to sit in the annual conference of the Minnesota Mdewakanton Sioux Indian." *Id.* at 7.
- Deleting the federal land assignment for the Minnesota Mdewakanton Sioux Indian, "Land Assignments. The land within the territory of the Prairie Island Indian Community which was purchased by the United States for the Mdewakanton Sioux residing in the State of Minnesota on May 20, 1886, and their descendants, may be assigned to any Minnesota Mdewakanton Sioux entitled thereto and may not be assigned to any other person although such person is a member of the Community." *Id.* at 9.

130. It is undisputed that the only acknowledged tribal entity under federal jurisdiction at the time of the enactment of the Indian Reorganization Act on June 18, 1934 was the Mdewakanton Sioux Indians of Minnesota

which was recognized to have reservation(s) at Prairie Island, Lower Sioux and Shakopee.

131. Department of the Interior correspondence and a 1938 Solicitor Opinion confirm that fact. **Exhibits C and D.**

132. The communities were recognized later not as tribal entities, but with non-tribal status of "Indians residing on reservation land" of the Mdewakanton Sioux Indians of Minnesota – hence the name "communities."

133. The 1936 lands at Prairie Island and Lower Sioux were held in trust by the United States for their respective corporations after the 1980 Act as indicated in the 1982 Federal Register.

134. In 1996, Congress at the community's request revoked the corporate charter of Prairie Island Indian Community.

135. The Prairie Island Indian Community in the State of Minnesota is not a beneficiary of the 1980 Act as it relates to the 1886 lands at Prairie Island.

136. From the Indian Reorganization enactment on June 18, 1934 through the 1980 Act, the federal understanding of the relationship between the Mdewakanton Sioux Indians of Minnesota and the three communities was consistent.

137. The Department maintained tribal trust accounts for the MSIM from the 1940's through 1982.

138. The Department of the Interior's 1979 listing specifically referenced the now-revoked corporation "Prairie Island Indian Community" and the Mdewakanton Sioux Indians of Minnesota's reservation: Prairie Island Indian Community, Prairie Island Reservation, Minnesota.[1]

139. From 1982 through 2000, the Department of the Interior specifically referenced the "Prairie Island Indian Community" as "of" the Mdewakanton Sioux Indians of Minnesota and of the Mdewakanton Sioux Indian of Minnesota's reservation:

> Prairie Island Indian Community of Minnesota Mdewakanton Sioux Indians of the Prairie Island Reservation in Minnesota.[2]

140. Then in 2002, inexplicably, although suspected as a response to other federal legal actions,[3] the Department of the Interior deleted the references to the Mdewakanton Sioux Indians of Minnesota in the 2002 list:

> Prairie Island Indian Community in the State of Minnesota (previously listed as the Prairie Island Indian Community of Minnesota Mdewakanton Sioux Indian of the Prairie Island Reservation in Minnesota).

---

[1] 44 Fed. Reg. 7235 (Feb. 6. 1979).
[2] 65 Fed. Reg. 13298 (Mar. 13, 2000); 63 Fed. Reg. 71941 (Dec. 30, 1998); 62 Fed. Reg. 55270 (Oct. 23, 1997); 61 Fed. Reg. 58211 (Nov. 13, 1996); 60 Fed. Reg. 9250 (Feb. 16, 1995); 58 Fed. Reg. 54364 (Oct. 21, 1993); 53 Fed. Reg. 52829 (Dec. 29, 1988); 47 Fed. Reg. 53133 (Nov. 24, 1982).
[3] *See, e.g., Lower Sioux Indian Cmty. in Minnesota v. United States*, 231 Ct. Cl. 1037, 1037 (1982); *Shakopee Mdewakanton Sioux (Dakota) Cmty v. Babbitt*, 906 F. Supp. 513 (D. Minn. 1995), *affirmed*, 107 F.3d 667 (8th Cir. 1997); *Smith v. Babbitt*, 100 F.3d 556 (8th Cir. 1996).

67 Fed. Reg. 46328 (Jul. 12, 2002).

141. Since 2002, the Department of the Interior has listed "Prairie Island Indian Community in the State of Minnesota" without reference to the dissolved corporation and the possessed lands.[4]

142. The 2016 proposed changes to the Constitution and Bylaws with the federal listing appear to be a federal effort to "officially" terminate the Mdewakanton Sioux Indians of Minnesota without a Congressional Act.

143. However, according to the D.C. Circuit, the Department's federal listings are not determinative of tribal claims; instead, the judicial branch may get the final word as part of its administrative oversight per the Administrative Procedures Act.

144. The D.C. Circuit in *Cherokee Nation of Oklahoma v. Babbitt*[5] considered a district court dismissal of a complaint brought by the Cherokee based on the federally–recognized Delaware Tribe as being a necessary and indispensable party that could not be joined in an APA proceeding because it had tribal sovereign immunity.

[4] 80 Fed. Reg.1942 (Jan. 14, 2015); 79 Fed. Reg. 4748 (Jan. 29, 2014); 78 Fed. Reg. 26384 (May 6, 2013); 77 Fed. Reg. 47868 (Aug. 10, 2012); 75 Fed. Reg. 60810 (October 1, 2010) with supplemental listing 75 Fed. Reg. 66124 (Oct.27, 2010); 74 Fed. Reg. 40218 (Aug. 11, 2009); 73 Fed. Reg. 18553 (Apr. 4, 2008); 72 Fed. Reg. 13648 (Mar. 22, 2007); 70 Fed. Reg. 71194 (Nov. 25, 2005); 68 Fed. Reg. 68180 (Dec. 5, 2003).

[5] *Cherokee Nation of Oklahoma v. Babbitt*, 117 F.3d 1489 (D.C. Cir. 1997).

145. The Court held that *the federal listing* of the Delaware Tribe was *not determinative of tribal sovereign immunity* vis-à-vis the Cherokee. Notwithstanding the federal listing of the Delaware Tribe, the court held that Delaware Tribe's status as a "separate sovereign" vis-à-vis the Cherokee had been relinquished by an 1867 Agreement.[6]

146. The D.C. Circuit concluded "that by entering into the 1867 Agreement the Delaware Tribe of Indians relinquished its tribal identity or sovereignty in relation to the Cherokee Nation."[7]

147. Similarly, the legal history of the Mdewakanton Sioux Indians of Minnesota, 1863 through present, demonstrates that the Prairie Island Indian Community in the State of Minnesota and the other communities are not "separate sovereigns;" therefore, the Department's listing is not determinative.

148. None of the Communities were organized as tribal under federal jurisdiction on June 18, 1934 when the IRA was enacted; only the MSIM was recognized as "tribal" and under federal jurisdiction on June 18, 1934.

149. Further, the United States Supreme Court in *Carcieri* wrote:

> [F]or purposes of [IRA] § 479, the phrase "now under Federal jurisdiction" refers to a tribe that was under federal jurisdiction at the time of the statute's enactment. As a result, § 479 limits the Secretary's

---

[6] *Id.* at 1501.
[7] *Id.* at 1503 (D.C. Cir. 1997).

> authority to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934. Because the record in this case establishes that the Narragansett Tribe was not under federal jurisdiction when the IRA was enacted, the Secretary does not have the authority to take the parcel at issue into trust.[8]

150. The communities were non-tribal organized based on Mdewakanton Sioux Indians of Minnesota "residing on reservation land" – not as tribes separate and apart from MSIM.

151. Consistent with these facts is the contemporaneous Department of the Interior correspondence and the 1938 Solicitor's Opinion which confirms each community as non-tribal without inherent tribal powers.

152. Under these facts and circumstances, the Department's application of 25 U.S.C. § 5123(f) and (g) does not terminate the acknowledged tribal status of MSIM.

153. Both the 1863 Act, in section 9, and the 1888-1890 Appropriation Acts provided the Secretary of the Interior legal authority to provide possession of land to the MSIM as a tribe which was done after the 1888-1890 Acts.

154. The administrative treatment of the reservation communities as non-tribal prior to 1994 is legally understandable because the 1888-1890

[8] *Carcieri,* 129 S.Ct. at 1061.

Appropriation Acts required "severance of tribal relations" provisions fan with the land.

155. However, the Department's policies, practices and customs treating the MSIM as if it was not an acknowledged tribe is in legal error.

**Under the 1994 amendments to the IRA, the Department's policies, practices and customs treating MSIM as not an acknowledged tribe violates the MSIM's rights and entitlements under federal law.**

156. 25 U.S.C. § 476 (f) and (g), 1994 amendments to the Indian Reorganization Act, provide that the Department of the Interior can no longer enforce "non-tribal" and other designations against federally-recognized Indian tribes:

> (f) Privileges and immunities of Indian tribes; prohibition on new regulations
>
> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.
>
> (g) Privileges and immunities of Indian tribes; existing regulations
>
> Any regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the

> privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect.

157. Under paragraphs (f) and (g), any past or future Department regulations, administrative decisions or determinations regarding the reservation communities being non-tribal 1888-1890 Appropriation Act's severance of tribal provisions has "no force or effect."

158. Importantly, the Department after the 1934 Indian Reorganization Act recognized the reservation communities under the IRA, but as non-tribal based on the severance of tribal relations provisions in the 1888-1890 Appropriation Acts.

159. Consequently, the Department only approved the reservation communities at Prairie Island, Lower Sioux, and Shakopee as non-tribal Indians residing on the MSIM's reservation lands – a unique method of organization under the IRA available until the 1988 amendments to the IRA occurred.

160. The 1988 amendments deleted this type of organization from the IRA on a going-forward basis, but preserved non-tribal "Indians residing on reservation" constitutions previously approved, including the three communities' constitutions, which had been based on this type of organization.

161. The MSIM objects to the Department's policies, practices and policies treating the MSIM and its rights terminated because of the application of 25 U.S.C. § 5123(f) and (g) to the reservation communities

162. The MSIM's modern function as a tribe is to determine status under the Indian Reorganization Act, to litigate and secure tribal benefits and maintain a list of eligible Minnesota Mdewakanton Sioux Indian lineal descendants.

163. The Department-approved Prairie Island and Lower Sioux Constitutions reflect that the MSIM meets annually with delegates appointed by the respective communities.

164. All three community constitutions reference rights of the MSIM.

165. Per their respective constitutions, none of the three communities are legally entitled to act on behalf of MSIM nor are they legally entitled to sue the United States on behalf of MSIM.

166. Each community is organized under the IRA as Indians residing on reservation land and is entitled to act and sue on behalf of those residents not on behalf of MSIM.

167. The MSIM in this lawsuit pursues two different land claims which the communities could not bring against the United States.

168. The first MSIM land claim is for federal land assignments for MSIM at Prairie Island since Congress in 1996 revoked the Prairie Island

Indian Community corporate charter terminating any beneficial interest the corporation had under the 1980 Act.

169. The second MSIM land is for the 12 square miles or legal equivalent set apart for MSIM by the Secretary of the Interior in 1865 under section 9 of the February 16, 1863 Act.

170. As to the Prairie Island federal land assignment claim, the communities have no stake in that claim because the beneficial interest under the 1980 Act was to the Prairie Island Indian Community corporation which was revoked in 1996 by Congress.

171. Second, similarly, as to the 12 square mile or legal equivalent claim, the lands were set aside for the MSIM in 1865 not for any of the communities recognized in 1936 and thereafter.

172. The MSIM also recognizes additional subject areas as possible areas of legal dispute between the MSIM and the United States.

173. MSIM's legal claims in these different subject areas may be based on treaty, statutory, and remaining aboriginal rights:

(1) Remaining federal land assignment rights regarding the communities' reservations;

(2) Half breed reservation tract on Lake Pepin, Minnesota;

(3) Reservation settlement areas near Fort Snelling, Coldwater Springs, Grey Cloud Island, Lake Calhoun, Hastings, Nicollet Island, Mendota, Bloomington;

(4) 2002 and prior sale of former Sioux reservation;

(5) Inadequate representation before Indian Claims Commission including Docket 363;

(6) Trust funds;

(7) Legal claims to hunting, fishing, gathering of foods, medicinal plants and other items for cultural uses within reservation and aboriginal lands; and

(8) Any other land, rights and moneys not currently identified.

174. The MSIM is solely entitled to proceed on any of these claims – not the communities as legal successors to MSIM.

**The MSIM has statutory rights to the 12 square miles awarded in 1865 under the February 1863 Act or legal equivalent.**

175. Prior to August 1851, the Minnesota Sioux lived along the Mississippi River, stretching from the Territory of Dakota to the Big Sioux River. *See Medawakanton and Wahpakoota Bands of Sioux Indians v. United States,* 57 Ct.Cl. 357, 359 (1922).

176. Originally, these Sioux were all Mdewakanton, but they later split into four bands, known as the Mdewakanton and the Wahpakoota (together comprising the "lower bands"), and the Sisseton and the Wahpeton (known as the "upper bands" or "Santee Sioux"). *Medawakanton and Wahpakoota Bands of Sioux Indians v. United States,* 57 Ct.Cl. 357, 359 (1922).

177. On September 29, 1837, the Sioux entered a treaty with the United States by which they ceded "to the United States all their land, east of

the Mississippi River, and all their islands in said river[,]" in consideration of the United States' investment of $300,000 for the benefit of the Sioux. Treaty of Sept. 29, 1837, arts. I–II, 7 Stat. 538 ("1837 Treaty").

178. Under the 1837 Treaty, the United States was required to pay an annuity to the Sioux at a rate of not less than five percent interest, such annuity to be paid "forever." Treaty of Sept. 29, 1837 art. II, 7 Stat. at 538.

179. In 1851, the Mdewakanton and Wahpakoota bands entered another treaty with the United States under which they ceded "all their lands and all their right, title and claim to any lands whatever, in the Territory of Minnesota, or in the State of Iowa[,]" and bound themselves to "perpetual" peace and friendship with the United States. Treaty of Aug. 5, 1851, arts. I–II, 10 Stat. 954 ("1851 Treaty").

180. This treaty stated that the government would provide to the bands, among other compensation, a trust fund of $1,160,000, with interest set at five percent, to be paid annually for a period of fifty years. Treaty of Aug. 5, 1851, art. IV, ¶ 2, 10 Stat. at 954.

181. The Sisseton and Wahpeton Bands signed a similar treaty on July 23, 1851, ceding all of their lands in the Territory of Minnesota and the State of Iowa, and "all of the lands owned in common by the four bands by natural boundaries." *Medawakanton,* 57 Ct.Cl. at 360; Treaty of July 23, 1851, art. II, 10 Stat. 949.

182. The Sisseton and Wahpeton Bands were to receive compensation comparable to that of the Mdewakanton and Wahpakoota bands, with a trust of $1,360,000 and interest at 5% to be paid out annually for fifty years. *See* Treaty of July 23, 1851, art. IV, ¶ 2, 10 Stat. at 949.

183. Article 3 of both 1851 treaties provided for the creation of a reservation for the Minnesota Sioux to run along the Minnesota River. *See Medawakanton,* 57 Ct.Cl. at 361.

184. Based upon that Article, the Sioux were removed to the reservation delineated in the treaty. *See Medawakanton, 57 Ct.Cl.* at 360.

185. The Senate, however, struck out the third article in its ratification of each of the treaties and instead agreed to pay the Sioux for the reservation lands at a rate of 10 cents per acre, the total sum to be added to the trust funds created by the treaties. *See Medawakanton, 57 Ct.Cl.* at 360.

186. The Senate also authorized the President to set aside another reservation outside the limits of the ceded land. *See Medawakanton, 57 Ct.Cl.* at 360.

187. The appropriate compensation corresponding to the ten-cents-per-acre rate was thereafter added to the trust funds created by the treaties, but the President never established an alternative reservation for the Sioux. *See Medawakanton, 57 Ct.Cl.* at 362.

188. The Sioux continued to live on the land originally intended to serve as their reservation under the 1851 treaties. *See Medawakanton, 57 Ct.Cl.* at 362.

189. In 1858, the United States entered into another treaty with the Sioux under which the Mdewakanton and Wahpakoota bands "agreed to cede that part of their reservation lying on the north side of the Minnesota River" in exchange for compensation, including money and goods, the exact amount of which would be determined by the Senate at a later time. *Medawakanton,* 57 Ct.Cl. at 365–66; Treaty of June 19, 1858, arts. I–III, 12 Stat. 1031 ("1858 Treaty").

190. The 1858 Treaty created a new reservation for the Sioux consisting of the land then occupied by the bands along the Minnesota River in south-central Minnesota. *See* 1858 Treaty, art. I, 12 Stat. 1031.

191. By entering the 1858 Treaty, the Mdewakanton and Wahpakoota bands of the Sioux Indians pledged "to preserve friendly relations with the citizens [of the United States], and to commit no injuries or depredations on their persons or property." *1858 Treaty,* art. VI, 12 Stat. at 1031.

*The 1862 Sioux Uprising*

192. In August of 1862, individuals from each of the four bands of the Minnesota Sioux revolted against the United States in response to its failure

to furnish the money and supplies promised in exchange for the Sioux lands under the aforementioned treaties.

193. In the course of that uprising, the Sioux killed more than 500 settlers and damaged substantial property, thereby breaching the 1851 and 1858 treaties.

194. After defeating the Sioux, the United States annulled its treaties with them, which had the effect of, among other things, voiding the annuities that had been granted and were then being paid to the Sioux as part of the terms of the 1837 and 1851 treaties and eliminating any possibility of compensation under the 1858 treaty. *See* Act of Feb. 16, 1863, ch. 37, 12 Stat. 652.

195. A portion of the remaining unexpended annuities was appropriated for payment to those settlers who had suffered damages as a result of the uprising. Act of Feb. 16, 1863, § 2, 12 Stat. at 652–53.

196. The United States also confiscated the Sioux lands in Minnesota, Act of Feb. 16, 1863, § 1, 12 Stat. at 652, and later directed that the Sioux be removed to tracts of land outside the limits of the then-existing states. *See* Act of Mar. 3, 1863, ch. 119, § 1, 12 Stat. 819.

197. Some of the Sioux, however, had been loyal to the United States during the uprising by either not participating in the revolt or affirmatively acting to save the settlers.

198. Nonetheless, Congress acted with a broad brush, declaring the Sioux's treaties void and annuities and allocation of land forfeited and failing to except from that termination the loyal Mdewakanton band of Sioux, whose annuity was valued at approximately $1,000,000.

199. Those Sioux who observed their pledge under the 1851 and 1858 treaties to maintain peaceful relations with the citizens of the United States were rendered "poverty-stricken and homeless." *Wolfchild,* 559 F.3d at 1232.

200. Many of the loyal Sioux had lost their homes and property but could not "return to their tribe ... or they would be slaughtered for the part they took in the outbreak." Cong. Globe, 38th Cong., 1st Sess. 3516 (1864).

*Congress Compensates the Loyal Mdewakanton*

201. Notwithstanding the broad termination of the Sioux treaties, Congress did attempt in the same Congressional Act to provide for the loyal Mdewakanton by including a specific provision for them in the Act of February 16, 1863.

202. The Congressional Record reflects that Congress intended to award the MSIM land under section 9 of the Act of February 16, 1863.

203. Senator Rice, speaking to the amount of land to be given to the loyal Mdewakanton, wanted to give the MSIM an appropriate amount of land: "I want the amount as large as will be necessary for the Indians, but

not so large as to induce others to wrong the Indians for the purpose of driving them out."

204. The legislative record shows Congress *intended to award* the loyal Mdewakanton for protecting the white settlers from massacre and *did so* with the passage of the Act at issue:

- "I think we should reward Indians who, under the circumstances that surround this case, exerted themselves to protect the white inhabitants. This was the opinion of the committee … that they ought to be rewarded, ought to be distinguished from other Indians, as an inducement hereafter, when the tribes should conclude to engage in war with the white people, to frustrate the designs and plans of the tribe, to give timely notice to the settlers."[9]

- "I think it would be good policy for us to offer to give these persons one hundred and sixty acres of land each … for rescuing the people of Minnesota and saving their wives and their daughters from massacre …. It is doing no more than what ought to be done … as proposed by the committee…."[10]

- "A vital change is absolutely necessary [of remodeling Indian law]. So long as we in our treatment of the Indians violate a positive injunction of Holy Writ, or induce them to violate it, they will continue to die out. I believe the good book says that man shall earn his living by the sweat of his brow …Whenever Congress shall adopt such as system as will cause the Indian to depend upon the soil for his living, from that moment forward the Indian will improve … he will go to work and raise his corn or his oats or his

[9] 27th Cong., 3d Sess. 514 The Congr. Globe (daily ed. Jan. 26, 1863) (Senator Harlan).
[10] *Id.* (Senator Doolittle).

> wheat … because the moment the Indian labors, as the American farmer, or the German, or the Irishman does, the objection to him is done away with … If you wish to reward him, give him forty acres…."[11]

- "We propose to make a present to those Indians who have distinguished themselves by their good conduct, to give them some land…."[12]
- "But, at the same time, we can reward these men; we can give them a piece of land, as much as the Senate may deem advisable…."[13]
- "The committee is of the opinion that no more money should be paid to the Indians; that whatever shall be paid to them hereafter should be paid in property."[14]
- "They shall be entitled to so much of the public lands, and that discretion will of course be exercised by the Secretary of the Interior ….."[15]

205. Consistent with Senator Rice's observation noted above, Congress would reduce the number of acres to the loyal Mdewakanton from 160 to 80 acres just prior to the passage of the February 1863 Act.[16]

206. Then, in 1865, the Secretary of Interior acted as Congress had intended by setting apart 12 square miles of land within Minnesota for

---

[11] *Id.* at 514-15 (Senator Rice).
[12] 27th Cong., 3d Sess. 515 The Congr. Globe (daily ed. Jan. 26, 1863) (Senator Fessenden).
[13] *Id.*
[14] *Id.* (Senator Harlan).
[15] *Id.*
[16] *Id.* at 516.

permanent occupancy by the loyal Mdewakanton and their descendant-heirs forever.

207. Thus, in the same law confiscating the Sioux land, Congress authorized the Department to create a land base for the MSIM:

> [T]he Secretary of the Interior is hereby authorized to set apart of the public lands, not otherwise appropriated, eighty acres in severalty to each individual of the before- named bands who exerted himself in rescuing the whites from the late massacre [by] said Indians. The land so set apart ... shall not be aliened or devised, except by the consent of the President of the United States, but shall be an inheritance to said Indians and their heirs forever.

Act of Feb. 16, 1863, § 9, 12 Stat. at 654.

208. As the U.S. Court of Appeals for the Federal Circuit found in a related litigation, the provision that the land would be "an inheritance to said Indians and their heirs forever[,]" "clearly would have created an inheritable beneficial interest in the recipients of any land conveyed under the statute." *Wolfchild,* 559 F.3d at 1241.

*The Secretary of Interior in March of 1865*
*Creates the 12 Square Mile*
*Reservation Under the Act of Feb. 16, 1863*
*– Creating Title in the Loyal Mdewakanton*

209. In 1865, the Secretary of the Interior, in fact, used his authority to set apart a 12 square mile reservation for the "Loyal Mdewakanton" who

exerted themselves in rescuing the whites from the late massacre by the hostile Mdewakanton.

210. Five documents, **Exhibits L, M, N, O, P,** show the Secretary of Interior conveyed the 12 square mile (also 12 sections or 7,680 acres) reservation to the Loyal Mdewakanton on March 17, 1865.

211. **Exhibit L**, a letter dated March 17, 1865, shows the Secretary of Interior's authorizing "Revd. S.D. Hinman, Missionary ... to designate twelve sections in a reasonably compact body and I will direct the local land offices to reserve the same from settlement or sale as soon as they are notified of Mr. Hinman's selection." **Exhibit L**.

212. In response, Reverend Hinman responded to the Secretary's directive by identifying 12 sections of land and he wrote the 12 sections down on the same Secretary letter of March 17, 1865. The 12 sections Reverend Hinman wrote down were in Redwood, Renville and Sibley Counties (Minnesota): Sections 1, 2, 3, 11 and 12, T. 112 N., R. 35; Section 35, T. 113 N., R. 35; Section 5, 6, 7, 8 and 9, T. 112 N., R. 34; Section 31, T. 113 N., R. 31. **Exhibit L**.

213. The Secretary of Interior *initialed* Reverend Hinman's selection – thereby setting the 12 sections apart and conveying the 12 sections to the Loyal Mdewakanton – including exclusive title, use and occupancy and right to quiet enjoyment. **Exhibit L**.

214. Six days later, on March 23, 1865 the Commissioner of Indian Affairs wrote to Rev. Hinman confirming the "decision of the Secy of the Interior already in your hands will be sufficient to authorize you to proceed to collect and establish the friendly Sioux upon the lands designated by you in your letter of the 17th instant." Exhibit 2.The Commissioner also noted that "Supt. Thompson has been authorized to expend a sum not exceeding eight hundred dollars for plowing land and for the purchase of farming tools and seeds for the Indians in question." **Exhibit M**.

215. In a letter written on the same date, March 23, 1865, Rev. Hinman's wrote to Bishop Whipple that "upwards of 10,000 acres of land [are] set apart for Taopi & friendly Sioux located at Redwood and including our dear little church. The Indians are to have 80 acres each – i.e., heads of families – in fees simple and unalienable. Clark Thompson, Supt, has agreed to furnish seed & plough the land for me…." **Exhibit N**.

216. However, in an undated letter written by Rev. Hinman to Bishop Whipple he would note white resistance to the Mdewakanton:

> The Sec. of the Interior, at our request, withdrew from sale, by Ex. Order, 10,000 acres for this purpose & located it at & near the old Lower Sioux Agency. Gen. Pope refuse[d] to let these Indians locate there, but Gen. Grant overruled Pope and order Sibley to allow the settlement to be made as we attempted. This was however prevented by the feeling at New Ulm and on the border generally consequent

> upon a recent cold blooded murder by the renegade Indians near Mankato. This 10,000 acres was being withheld from sale for some years, but finally restored for sale.

**Exhibit O**.

217. The white resistance would reach the Secretary of the Interior through a report dated April 29, 1866 confirming Rev. Hinman's own assessment: "Action was taken by the department, about one year ago, to select for them eighty acres of land each upon the old reservation, but the feeling among the whites is such as to make it impossible for them to live there in safety." **Exhibit P**.

218. The Department in a May 18, 1869 letter acknowledged the lands had been set apart by the Secretary of the Interior in 1865 for MSIM – legally "forever" under Section 9 of the February 1863 Act -- but nonetheless recommended selling the land to the public because the MSIM were difficult to find and impractical to locate:

> It appears from the papers on file on file on this subject that the lands with-held are all or nearly all occupied by settlers and that they are surrounded by settlements[.] I am therefore of opinion that it would be better to restore these lands to market as it will probably be impracticable to locate Indians on the same.

**Exhibit R.**

219. The Department later sold to the public the MSIM's set-apart 12 square miles of public lands.

220. Then and now, "local white hostility" is a legally insufficient excuse for violating Section 9 of the February 1863 Act because the twelve square miles of public lands, once set apart, were for the MSIM lineal descendants "forever."

**The Department of Interior refuses to acknowledge the Mdewakanton Sioux Indians of Minnesota.**

221. Representatives of the Mdewakanton Sioux Indians of Minnesota have attempted to contact and discuss matters related to the claims made in this Complaint with the Department of the Interior.

222. Agents and representatives of the Department of the Interior have refused to acknowledge the Mdewakanton Sioux Indians of Minnesota.

223. Under the IRA, 25 U.S.C. § 5130(1), the term "Indian tribe" means "any Indian … tribe, band, nation, pueblo, village or community that the Secretary of the Interior acknowledges to exist as an Indian Tribe." (Underline added.).

224. The Secretary of Interior has repeatedly acknowledged the Mdewakanton Sioux Indians of Minnesota as a tribe.

225. So, the MSIM is an "Indian tribe" under the IRA, even though it is not "recognized" on the Department's list.

226. Under the IRA, 25 U.S.C. § 5130 (2), "the term 'list' means the list of recognized tribes published by the Secretary pursuant to section 5131 of this title."

227. Under 25 U.S.C. § 5131(a), the Secretary of the Department of the Interior is to publish "a list of all Indian tribes which the Secretary *recognizes* to be eligible for special programs and services provided by the United States to Indians because of their status as Indians." (Emphasis added).

228. Thus, the "list" referenced under 25 U.S.C. § 5130(2) does not include acknowledged, not recognized Indian tribes in the United States.

229. The list under 25 U.S.C. § 5131 does not include all Indian tribes the Secretary of the Interior acknowledged as Indian tribes on June 18, 1934.

230. The Mdewakanton Sioux Indians of Minnesota is not on the list of Indian tribes which is published under 25 U.S.C. § 5131, and the lack of the Secretary's recognition of the tribe does not preclude a judicial determination that the Mdewakanton Sioux Indians of Minnesota is acknowledged as a tribe and existed on June 18, 1934 under federal jurisdiction, and remains in existence because Congress has not passed an act to terminate the tribe.

## COUNT I
## Violation of the Administrative Procedure Act

231. Plaintiffs re-allege all paragraphs above as is fully set forth herein.

232. Under 25 U.S.C. § 5121, "nothing in this [Indian Reorganization] Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States."

233. The Mdewakanton Sioux Indians of Minnesota, is a tribe that has been acknowledged by the Secretary of the Interior and was under federal jurisdiction on June 18, 1934.

234. The fact that the Mdewakanton Sioux Indians of Minnesota has not further organized to be recognized under the IRA does not preclude it from the instant claim.

235. The fact that the Mdewakanton Sioux Indians of Minnesota have not been recognized by the Secretary of the Interior on the list does not preclude it from making the instant claim.

236. The Department of the Interior's policies, practices, and customs violate the MSIM's rights and entitlements under federal law by not consulting directly with them on matters such as termination of the federal land assignment system for the Mdewakanton Sioux Indians of Minnesota at

Prairie Island Indian Community such as the 12 square miles or legal equivalent they are entitled to because the Secretary of the Interior set apart 12 square miles for them "forever" under the February 1863 Act, and such as termination of the MSIM without a termination statute.

237. The Department of the Interior's policies, practices and customs have denied consultation to the Plaintiffs as Mdewakanton Sioux Indians of Minnesota regarding matters such as termination of the federal land assignment system for the Mdewakanton Sioux Indians of Minnesota at Prairie Island Indian Community, about the 12 square miles or legal equivalent they are entitled to because the Secretary of the Interior set apart 12 square miles for them "forever" under the February 1863 Act, and about termination of the MSIM without a termination statute in violation of the Administrative Procedure Act ("484"), 5 U.S.C. § 706.

238. The Defendants have failed to provide Mdewakanton Sioux Indians of Minnesota with federal acknowledgement as a tribe, failed to provide possession of 12 square miles of land awarded in 1865 or legal equivalent and failed to provide a federal land assignment system at Prairie Island for their present interests in those lands.

239. The Defendants have been informed of their legal duties to the Mdewakanton Sioux Indians of Minnesota, including decades of litigation

and decades of petitions and letters by Minnesota Mdewakanton Sioux Indian lineal descendants, and violate those legal duties anyway.

240. The Department of the Interior's violations of legal duty to the Mdewakanton Sioux Indian of Minnesota under the 1863 Act, 1888-1890 Appropriation Acts, Indian Reorganization Act, 1980 Act and other statutes are arbitrary, capricious, abuses of discretion, and not in accordance with the law, pursuant to 5 U.S.C. § 706(2)(A), and in excess of Defendants' statutory jurisdiction, pursuant to 5 U.S.C. § 706(2)(C).

## COUNT II
## Declaratory Judgment

241. The Plaintiffs re-allege all paragraphs above as is fully set forth herein.

242. As previously asserted, representatives of the Mdewakanton Sioux Indians of Minnesota have attempted to contact and discuss matters related to the claims made in this Complaint with the Department of the Interior.

243. Agents and representatives of the Department of the Interior have refused to acknowledge the Mdewakanton Sioux Indians of Minnesota as a tribe.

244. Under the IRA, 25 U.S.C. § 5130(1), the term "Indian tribe" means "any Indian … tribe, band, nation, pueblo, village or community that

the Secretary of the Interior acknowledges to exist as an Indian Tribe." (Underline added.).

245. The Secretary of Interior has repeatedly acknowledged the Mdewakanton Sioux Indians of Minnesota as a tribe.

246. Under the IRA, 25 U.S.C. § 5130 (2), "the term 'list' means the list of recognized tribes published by the Secretary pursuant to section 5131 of this title."

247. Under 25 U.S.C. § 5131(a), the Secretary of the Department of the Interior is to publish "a list of all Indian tribes which the Secretary *recognizes* to be eligible for special programs and services provided by the United States to Indians because of their status as Indians." (Emphasis added).

248. The "list" referenced under 25 U.S.C. § 5130(2) is not an exhaustive list of Indian tribes in the United States.

249. The list under 25 U.S.C. § 5131 does not include all Indian tribes the Secretary of the Interior acknowledged as Indian tribes on June 18, 1934.

250. The Mdewakanton Sioux Indians of Minnesota is not on the list of Indian tribes which is published under 25 U.S.C. § 5131, and the lack of the Secretary's recognition of the tribe does not preclude a determination that the Mdewakanton Sioux Indians of Minnesota was acknowledged as a tribe

and existed on June 18, 1934 under federal jurisdiction, and remains in existence because Congress has not passed an act to terminate the tribe.

251. An actual controversy exists between the Plaintiffs as to Plaintiffs' rights with respect to Defendants' legal duties to consult with the Mdewakanton Sioux Indians of Minnesota on matters such as termination of the federal land assignment system at Prairie Island Indian Community, regarding future land assignments under the 1863 Act, 1888-1890 Appropriation Acts and 1980 Act at Prairie Island and elsewhere, regarding 12 square miles awarded under the 1863 Act or legal equivalent and whether the Defendants have violated those legal duties if they exist and regarding termination of MSIM.

252. Plaintiffs pray that this Court declares and determines, pursuant to 28 U.S.C. § 2201,that the Defendants' policies, practices and customs have violated the statutory rights of Plaintiff under the 1863 Act, 1888-1890 Appropriation Acts, Indian Reorganization Act, the 1980 Act and other laws by not consulting with the Mdewakanton Sioux Indians of Minnesota; by not providing a federal land assignment system at Prairie Island; by failing to make future land assignments under the 1863 Act, 1888-1890 Appropriation Acts and 1980 Act; and by failing to provide possession of the 12 square miles of land awarded in 1865 by the Secretary of the Interior under the 1863 Act or legal equivalent to MSIM.

**COUNT III**
**Injunction**

253. The Plaintiffs re-alleges all paragraphs above as is fully set forth herein.

254. Under 25 U.S.C. § 5121, "nothing in this [Indian Reorganization] Act shall be construed to impair or prejudice any claim or suit of any Indian tribe against the United States."

255. The Mdewakanton Sioux Indians of Minnesota is a tribe that has been acknowledged by the United States and was under federal jurisdiction on June 18, 1934.

256. The fact that the Mdewakanton Sioux Indians of Minnesota as a federally-acknowledged tribe has not yet organized under the IRA does not preclude it from the instant claim.

257. The fact that the Mdewakanton Sioux Indians of Minnesota has not been recognized by the Secretary of the Interior does not preclude it from making the instant claim.

258. The Department of the Interior's policies, practices, and customs have violated the statutory rights of the Plaintiffs under the 1863 Act, 1888-1890 Appropriation Acts, Indian Reorganization Act, the 1980 Act and other laws by not consulting with the Mdewakanton Sioux Indians of Minnesota about the termination of the federal land assignment system at Prairie Island

Indian Community, by failing to provide land assignments under the 1863 Act, 1888-1890 Appropriation Acts and 1980 Act and by failing to provide the 12 square miles awarded under the 1863 Act or legal equivalent.

259. Plaintiffs pray that this Court issue an injunction against the Department of the Interior: requiring the Defendants to consult with the Mdewakanton Sioux Indians of Minnesota as a tribe; requiring the Defendants to immediately commence future land assignments under the 1863 Act, 1888-1890 Appropriation Acts and 1980 Act to MSIM; and requiring Defendants to provide possession of the 12 square miles of land awarded in 1865 under the February 1863 Act or a legal equivalent to MSIM.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, on behalf of themselves and all others similarly situated, request that this Court:

1. Enter judgment in favor of the Plaintiffs on Counts I, II and III;
2. Declare that the Defendants have violated the statutory rights of the Plaintiffs under the 1863 Act, 1888-1890 Appropriation Acts, Indian Reorganization Act, the 1980 Act and other laws by not consulting with the Mdewakanton Sioux Indian of Minnesota and by not providing a federal land assignment system at Prairie Island; by failing to make future land assignments under the 1863 Act, 1888-1890 Appropriation Acts and 1980 Act; and by failing to provide

possession of the 12 square miles of land awarded under the 1863 Act or legal equivalent to MSIM;

3. Issue an injunction against the Department of the Interior requiring the Defendants to consult with the Mdewakanton Sioux Indian of Minnesota regarding the federal land assignment system at Prairie Island; requiring the Defendants to begin future land assignments under the 1863 Act, 1888-1890 Appropriation Acts and 1980 Act; and requiring Defendants to provide possession of the 12 square miles of land awarded in 1865 under the February 1863 Act or a legal equivalent to MSIM;
4. Award attorney fees, expenses, costs and disbursements under the federal Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A);
5. Award costs and disbursements to the Plaintiffs; and
6. Grant whatever additional relief the Court finds just and equitable.

DATED: November 23, 2016.

/s/Erick G. Kaardal

Erick G. Kaardal (WI0031)
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Facsimile: (612) 341-1076
Email: kaardal@mklaw.com
*Attorneys for Plaintiffs*

VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 23, 2016. /s/ Margo Bellanger
Margo Bellanger

Executed on November 23, 2016. /s/ Tina Jefferson
Tina Jefferson

Executed on November 23, 2016. /s/Michael J. Childs, Jr.
Michael J. Childs, Jr.