# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |  |
|---|---|---|---|
| MDEWAKANTON SIOUX INDIANS | : | | |
| OF MINNESOTA, *et al.*, | : | | |
| | : | Civil Action No.: | 16-2323 (RC) |
| Plaintiffs, | : | | |
| | : | | |
| v. | : | Re Document Nos.: | 10, 11 |
| | : | | |
| RYAN ZINKE,[1] Secretary, | : | | |
| United States Department of the Interior, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

CONSTRUING DEFENDANTS' MOTION TO DISMISS AS A MOTION FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
GRANTING FEDERAL DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

## I. INTRODUCTION

Plaintiffs seek to compel the Department of the Interior to consult with them as an Indian tribe. Defendants move to dismiss for, among other reasons, failure to exhaust administrative remedies and the statute of limitations. For the reasons discussed below, the Court converts Defendants' motion to a motion for summary judgment, and grants Defendants summary judgment because Plaintiffs have failed to exhaust their administrative remedies.

## II. BACKGROUND[2]

Plaintiffs consist of three individuals and the Mdewakanton Sioux Indians of Minnesota (MSIM), a group that Plaintiffs assert is an American Indian tribe acknowledged by the federal

---

[1] Secretary Zinke is substituted as a defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] For the purposes of resolving this motion, the Court accepts the factual allegations of the plaintiff. *See Talenti v. Clinton*, 102 F.3d 573, 574 (D.C. Cir. 1996).

government. Compl. at 1–2, ECF No. 1. Plaintiffs bring suit against the Secretary of the United

States Department of the Interior and the United States. Plaintiffs' expansive complaint seeks

relief under the Administrative Procedure Act (APA). Compl. ¶¶ 231–40. In addition to their

APA claims, Plaintiffs seek declaratory and injunctive relief regarding the same claims. Compl.

¶¶ 241–59.

Although Plaintiffs request relief in several areas, they center on the claim that, although

Defendants are required to consult with all tribes, Defendants have refused to consult with

Plaintiffs.[3] *See* Compl. ¶ 236 (asserting that Defendants' "policies, practices, and customs"

violate Plaintiffs' "rights and entitlements under federal law" because Defendants do not

"consult[] directly with" Plaintiffs).

---

[3] Neither Plaintiffs nor Defendants identify a statute requiring the Department to consult with tribes. The Court notes that the Department of the Interior has issued a Departmental Manual addressing "government-to-government consultation" with Indian Tribes. Department of the Interior, Department Manual, Part 512 DM 4, https://elips.doi.gov/ELIPS/DocView.aspx?id=4220&dbid=0. According to the Departmental Manual, "It is the policy of DOI to . . . consult with tribes on a government-to-government basis whenever DOI plans or actions have tribal implications." *Id.* at § 4.4. The Departmental Manual identifies Executive Order 13,175 as its basis. The Executive Order required each agency to develop "an accountable process to ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications." Exec. Order No. 13,175 § 5, 65 Fed. Reg. 67,249 (Nov. 6, 2000), https://www.gpo.gov/fdsys/pkg/FR-2000-11-09/pdf/00-29003.pdf.

Both the Departmental Manual and the Executive Order limit consultation to only tribes acknowledged by the Secretary of the Interior and included on a federal list. *See* Department Manual § 4.3(A) (defining an Indian Tribe which must be consulted as "[a]ny American Indian or Alaska Native tribe, band, national, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Tribe List Act of 1994"); Exec. Order No. 13,175 § 1(b) (defining an Indian Tribe as "an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe pursuant to the Federally Recognized Indian Tribe List Act of 1994"). Although Plaintiffs repeatedly make the contrary claim that "MSIM does not have to apply to the Department to be 'recognized' prior to seeking its right of consultation as an 'acknowledged' tribe," apparently because "there is a distinct difference between an 'acknowledged tribe' and a 'recognized tribe,'" Pls.' Opp'n at 24, ECF No. 13, they offer no authority for this proposition.

First, the Court summarizes Plaintiffs' description of the MSIM's history as a tribe. According to Plaintiffs, the MSIM were acknowledged by an act of Congress on February 16, 1863 (Act of 1863). That statute referred to the MSIM in the context of annulling several treaties, including a treaty with the MSIM. Act of Feb. 16, 1863, 12 Stat. 652 (1863) ("Whereas the United States heretofore became bound by treaty stipulations to the . . . Medawakanton[4] . . . bands of the Dakota or Sioux Indians . . . . Be in enacted . . . [t]hat all treaties heretofore made and entered into by the . . . Medawakanton . . . bands of Sioux or Dakota Indians . . . with the United States, are hereby declared to be abrogated and annulled . . . .").[5] Plaintiffs assert that, after being recognized by the federal government, the tribal status of the MSIM has never been terminated. Compl. ¶¶ 10–11. Plaintiffs define the current MSIM as "those American Indians and lineal descendants who remained or returned to Minnesota in or about 1863 whom Congress identified as a band of Indians as reflected in the Act of February 1863." Compl. ¶ 12. The individual plaintiffs argue that they are members of MSIM, Compl. ¶¶ 17–22, and they attach a list of several thousand other individuals who "self-identify" as MSIM, Compl. ¶ 24; ECF No. 1-1, Ex. A.

Plaintiffs do not dispute that the MSIM is not "recognized" by the Secretary of the Interior or included on the list of Indian tribes published by the Secretary pursuant to 25 U.S.C. § 5130(2) *et seq. See, e.g.*, Compl. ¶¶ 246–50. However, Plaintiffs assert that they have been "acknowledged" by the Secretary in the past—although the Secretary currently refuses to

---

[4] "Medawakanton" appears in various documents. Neither party disputes that this is an alternative spelling of "Mdawakanton."

[5] Plaintiffs also identify the Appropriation Act of June 29, 1888, 25 Stat. 228, stating that land was to be purchased "[f]or the support of the full-blood Indians in Minnesota, belonging to the Medawakanton ban[d] of Sioux Indians . . ." as an acknowledgement of their tribe. Compl. ¶ 34.

Plaintiffs further cite two Department of the Interior documents from 1935 as evidence that the Department "recognize[d]" the MSIM after the 1934 passage of the Indian Reorganization Act, Compl. ¶¶ 50–54, although both documents describe the conclusions of the Department that at least some MSIM members cannot be recognized as a tribe. *See generally* note 8, *infra.*

acknowledge them—and this status is sufficient for the relief they seek. Compl. ¶¶ 243, 245, 257. Plaintiffs argue that, because they are an acknowledged tribe, Defendants are required to consult with them, Compl. ¶ 236, and the refusal to consult is equivalent to "termination of the MSIM without a termination statute in violation of the [APA]." Compl. ¶¶ 236–37, 251.

Plaintiffs' description of the injuries Defendants have inflicted upon them is lengthy and wide-ranging. After wrestling with Plaintiffs' complaint, *cf. infra* Part III, the Court understands their claim to focus on Defendants' alleged refusal to consult with Plaintiffs concerning proposed constitutional amendments to the constitution of the Prairie Island Indian Community and changes to the land assignment system at Prairie Island. However, Plaintiffs also provide, apparently in way of context, references to various other events that they do not specifically tie to a cause of action.

First, the Court summarizes Plaintiffs' allegations concerning consultation on the proposed changes at Prairie Island. *See, e.g.*, Compl. ¶ 125 (arguing that Defendants are required to "consult[] directly with [MSIM] regarding all matters affecting the [MSIM] and its rights vis-à-vis [PIICSM] and the other communities"); *see also* Compl. ¶¶ 167–69 ("The MSIM in this lawsuit pursues two different land claims . . . . [first,] for federal land assignments for MSIM at Prairie Island . . . .").

This claim requires a brief detour into the history of the lands and MSIM members at Prairie Island. The federal government purchased land at Prairie Island[6] in accordance with the 1888–1890 Appropriations Acts—and, according to Plaintiffs, this land was purchased on behalf of the MSIM. Compl. ¶¶ 14, 34; *see also* Pls.' Surreply Mem. (Pls.' Surreply), ECF No. 22 at 5. After the lands were purchased, the Secretary of the Interior assigned lands to some, but not all,

---

[6] Plaintiffs' complaint also mentions similarly situated lands purchased elsewhere in Minnesota, including at Lower Sioux and Shakopee, but Plaintiffs do not raise claims concerning those areas. *See, e.g.*, Compl. ¶¶ 34, 38, 40, 42.

MSIM members (because insufficient land was available) and thus only some of the MSIM

members lived on the purchased lands. Compl. ¶¶ 35–37. Later, those MSIM members living on

the purchased lands organized into the Prairie Island Indian Community in the State of

Minnesota (PIICSM) in accordance with the Indian Reorganization Act of 1934. Compl. ¶¶ 39–40.

PIICSM was organized in the non-tribal form of Indians residing on a reservation.[7] Compl. ¶ 44.

According to Plaintiffs, those MSIM members who lived in the organized communities severed

their tribal relations, but those without land assignments did not. Compl. ¶¶ 38, 40, 43. The entity

at Prairie Island also organized into a corporation, the Prairie Island Indian Community (PIIC).

Compl. ¶ 104. Plaintiffs assert that there is a difference between PIICSM, the federally

recognized community, and PIIC, the corporation.[8] *See* Compl. ¶¶ 106–14. In 1980, a federal

---

[7] The federal government apparently believed that the acts authorizing the purchase of land required the MSIM to sever their tribal relations, and they could therefore no longer be organized as a tribe, but only as communities on reservations. Multiple communities were created because of the distance between the different areas of land. *See* Letter from John Collier to Joe Jennings (Nov. 27, 1935), ECF No. 1-1, Ex. C ("Some 1151 acres of land . . . have been purchased for [the Mdewakanton Sioux Indians] under various appropriation acts. . . . The Indians were permitted to use these lands under assignment established by the Department. . . . These Indians cannot be recognized as a tribe. The statutes providing for land purchased for these Indians expressly restricted the use of such lands to Indians who have abandoned their tribal relations. . . . The only basis of organization, therefore for these Indians is residence on a reservation."); *see also* Mem. to the Comm'r of Indian Affairs from Charlotte T. Westwood and J.R. Venning (undated), ECF No. 1-1, Ex. D (explaining that the Prairie Island and Lower Sioux communities were organized separately because "[t]he constitution submitted in October for the Mdewakanton Sioux proposed a single organization. . . . On the legal side, however, it was subsequently determined by the Solicitor . . . that these Indians had under the land purchase acts abandoned tribal relations and therefore were not privileged to organize as a tribe over various reservati [sic] Their only basis of organization was as Indians residing on a reservation. It was the opinion of your representatives . . . that the communities were too widely separated to be considered or treated as one reservation . . . Under present law, the land which is the basis of [the Prairie Island and Lower Sioux] communities was land purchased for the Mdewakanton Sioux residing in Minnesota . . . .").

[8] The Court notes that the constitution of the federally-recognized community reads "Prairie Island Indian Community," ECF No. 1-1, Ex. I, but acquiesces in Plaintiffs' terminology for the purpose of this opinion.

statute was passed which Plaintiffs assert "placed the parcels at Prairie Island in trust for the [PIIC]" but "preserved the property rights of the MSIM assignees." Compl. ¶¶ 104–05; Act of Dec. 1980, Pub L. 9-557, 94 Stat. 3262. According to Plaintiffs, this beneficial interest was limited to PIIC, the corporation, rather than PIICSM. Compl. ¶ 106; ¶¶ 87–117. In 1996 the Prairie Island community requested that the corporate charter of PIIC be revoked, and Congress acceded. Compl. ¶¶ 109–11. Plaintiffs therefore argue that, because of that revocation, PIICSM (the federally-recognized entity) has no beneficial interest over the lands at Prairie Island, Compl. ¶ 114, and the beneficial interest has reverted to the MSIM, Compl. ¶ 115. In particular, Plaintiffs appear to believe that they are entitled to a particular parcel of the land at Prairie Island. *See* Compl. ¶ 115 ("6096 Whipple Way now belongs to the [MSIM] generally—and should be assigned to the Plaintiff representatives specifically.").

Against this backdrop, Plaintiffs argue that recent proposed changes to the PIICSM constitution will, among other injuries, injure their rights to the lands at Prairie Island. PIICSM, the federally-recognized entity, has a constitution. Compl. ¶ 44; *see also* Prairie Island Indian Community Constitution, ECF No. 1-1, Ex. E. According to Plaintiffs, the constitution includes references to the PIICSM as part of the larger group of the MSIM and provides for an annual MSIM conference. Compl. ¶¶ 45, 59, 61–62. Recently, the PIICSM has sought to amend its constitution through the Department's Secretarial election process. Plaintiffs object that the proposed amendments "eliminate all references to the MSIM and its rights," Compl. ¶ 123, and "appear to be a federal effort to 'officially' terminate the [MSIM] without a Congressional Act," Compl. ¶ 142. S*ee* Compl. ¶ 129 (listing Plaintiffs' objections to the proposed revisions). Plaintiffs also appear to view the proposed constitutional amendments as related to their alleged loss of rights under the land assignment system. *See* Compl. ¶¶ 77–80 (complaining that

Defendants did not consult Plaintiffs about the "termination of the federal land assignment system and the annual meetings" under the proposed constitutional amendments). For these reasons, Plaintiffs argue that the proposed amendments violate their rights.[9] Compl. ¶ 123.

Finally, the Court reaches the kernel of Plaintiffs' complaint. Plaintiffs argue that they have requested that the Department consult with them concerning the proposed constitutional amendments and changes to the land assignment system, but that the Department has refused to do so in violation of the APA. *See* Compl. ¶ 80 (in relation to the proposed constitutional amendments for the Prairie Island Indian Community, Plaintiffs complain that "the Department of the Interior does not consult with the [MSIM] about the termination of their rights, including the termination of the federal land assignment system and the annual meetings for the [MSIM]"); *see also* Pls.' Mem. Opp'n Fed. Defs.' Mot. Dismiss (Pls.' Opp'n) at 31, ECF No. 13 ("MSIM representatives contacted the Department in 2016 requesting consultation regarding the PIIC constitutional amendments and the 30 acre land assignments at PIIC . . . .").

As previously mentioned, Plaintiffs' complaint refers to a variety of other topics, which the Court sketches briefly. Plaintiffs' argue that they have been deprived of some rights to a twelve square mile area of land dating from an 1863 Act.[10] *See* Compl. ¶¶ 167–69 ("The MSIM

---

[9] The Court previously addressed and rejected Plaintiffs' request for a temporary restraining order and preliminary injunction concerning the proposed amendments to the PIICSM constitution. *See generally* Order, ECF No. 20; Mem. Op., ECF No. 21. As discussed in this opinion, the Court now rejects the underlying claims.

Plaintiffs' complaint alludes to a new set of rules adopted by the Department of the Interior for handling Secretarial elections. Compl. ¶¶ 123–125, *see also* 80 Fed. Reg. 63094. Although it appears that Plaintiffs believe the new rules are improper in some way, Plaintiffs do not explain what the new rules change or why these changes are impermissible. The Court understands Plaintiffs' reference to the new rules to refer only to Plaintiffs' claim that the Defendants' "policies, practices, and customs violate the rights of the [MSIM] by not consulting directly with it" concerning the secretarial elections. Compl. ¶¶ 77–80, 125.

[10] According to Plaintiffs, the Act of February 16, 1863 was intended to "award the MSIM land." Compl. ¶ 202. That Act authorized the Secretary of the Interior to "set apart"

in this lawsuit pursues two different land claims[, second,] . . . for the 12 square miles or legal

equivalent set apart for the MSIM by the Secretary of the Interior in 1865 under section 9 of the

February 16, 1863 Act."). In addition, Plaintiffs' complaint contains a skeletal description of

eight "additional subject areas as possible areas of legal dispute."[11] Compl. ¶¶ 172–73. Plaintiffs

do not state if they have ever sought or been denied consultation with Defendants concerning the

twelve square mile area of land or any of their eight additional topics. As discussed in greater

depth in Part III, the Court is unable to identify any claims beyond Plaintiffs' claim that

Defendants refused to consult with them in 2016 concerning the proposed constitutional

---

public land as "an inheritance to said Indians and their heirs forever." Compl. ¶ 207; Pls.'
Surreply at 2–5, ECF No. 22; *see also* Act of Feb. 16, 1863, ch. 37, 12 Stat. 652, App. 126–28.
The Secretary of the Interior asked for his designee to select land, and initialed the selection of
twelve square miles. Compl. ¶¶ 211–13. Plaintiffs argue that this initialing sufficed to set aside
land and convey it to the MSIM. Compl. ¶¶ 84, 213. Plaintiffs claim that these lands were then
sold to the public instead of being preserved for the MSIM. Compl. ¶ 85 ("[T]he [MSIM] were
unable to settle there due to local white hostility."); Compl. ¶¶ 216–19; Pls.' Surreply at 2–5; *see
also* Act of Feb. 16, 1863, App. 126–28. When the land was sold and when Plaintiffs allege they
should have been consulted is not clear. Plaintiffs now argue that they are entitled to either the
twelve square miles or an equivalent. Compl. ¶ 236–38.

[11] The eight areas are:

(1) Remaining federal land assignments rights regarding the communities'
reservations;
(2) Half breed reservation tract on Lake Pepin, Minnesota;
(3) Reservation settlement areas near Fort Snelling, Coldwater Springs, Grey
Cloud Island, Lake Calhoun, Hastings, Nicollet Island, Mendota,
Bloomington;
(4) 2002 and prior sale of former Sioux reservation;
(5) Inadequate representation before Indian Claims commission including
Docket 363;
(6) Trust funds;
(7) Legal claims to hunting, fishing, gathering of foods, medicinal plants and
other items for cultural uses within reservation and aboriginal lands; and
(8) Any other land, rights and moneys not currently identified.

Compl. ¶ 173. Plaintiff's surreply elaborates on their argument concerning (2), an area of land at
Lake Pepin, which Plaintiffs apparently believe they are entitled to purchase through "equitable
pricing," Pls.' Surreply at 1–2, 6, *see also* Act of July 17, 1854, 10 Stat. 304, App. 21.

amendments and changes to the land assignment system at Prairie Island. Any other claim cannot be discerned by this Court and would be susceptible to dismissal for failure to state a claim.

Defendants moved to dismiss Plaintiffs' claims for multiple reasons. *See generally* Fed. Defs.' Mot. Dismiss & Mem. Supp. (Defs.' MTD), ECF No. 10. Plaintiffs opposed the motion. *See generally* Pls.' Opp'n. In addition, Plaintiffs were granted leave to file and filed a surreply in response to Defendants' reply. *See generally* Pls.' Surreply Mem. (Pls.' Surreply), ECF No. 22; *see also* Minute Order of June 20, 2017. Defendants' motion is thus ripe for adjudication.[12]

## III. DISCUSSION

To frame its analysis, the Court must determine the scope of Plaintiffs' claims. It is clear that Plaintiffs assert an APA claim based on Defendants' alleged refusal to consult. *See* Compl. ¶¶ 231–40 ("Count I: Violation of the Administrative Procedure Act"). It is also clear that Plaintiffs seek declaratory and injunctive relief relating to that claim. *See* Compl. ¶¶ 241–59 ("Count II: Declaratory Judgment" and "Count III: Injunction").

---

[12] Plaintiffs requested oral argument on Defendants' motion to dismiss. Pls.' Opp'n at 1, ECF No. 13. Because oral argument would not assist the Court, the Court denies the motion for oral argument. *See* LCvR 7(f) (stating that "allowance [of oral argument] shall be within the discretion of the Court").

In addition, Defendants seek for this Court to take judicial notice of the opposition to the motion to dismiss filed in the lawsuit *Wolfchild v. Redwood County* (*Redwood County*), 824 F.3d 761 (8th Cir. 2016), *cert. denied* 137 S. Ct. 447 (2016). Fed. Defs.' Mot. Judicial Notice, ECF No. 11. Plaintiffs do not oppose judicial notice. The Federal Rules of Evidence permit a court to take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Because a publicly available court filing meets these criteria, the Court grants Defendants' motion for judicial notice. *See SEC v. Bilzerian*, 112 F. Supp. 2d 12, 15 (D.D.C. 2000), *aff'd*, 75 F. App'x 3 (D.C. Cir. 2003) ("Per [the defendant's] request, the Court takes judicial notice of the briefs and petition for rehearing filed with the United States Court of Appeals for the Eleventh Circuit." (citing Fed. R. Evid. 201)).

Finally, construing Defendants' motion to dismiss as incorporating a motion to waive compliance with Local Civil Rule 7(n), Defs.' MTD at 1 n.1, ECF No. 10, the Court grants the motion because the administrative record is not necessary for its decision here.

First, the Court attempts to identify the specific topics and occasions on which Plaintiffs allege that they were wrongfully denied consultation. Plaintiffs' complaint alludes to several topics on which Plaintiffs assert consultation was due. *See* Compl. ¶ 237 ("[The Defendants] have denied consultation to the Plaintiffs as Mdewakanton Sioux Indians of Minnesota regarding matters such as termination of the federal land assignment system for the Mdewakanton Sioux Indians of Minnesota at Prairie Island Indian Community, about the 12 square miles or legal equivalent they are entitled to because the Secretary of the Interior set apart 12 square miles for them 'forever' under the February 1863 Act, and about termination of the MSIM without a termination statute in violation of the Administrative Procedure Act . . . ."). However, Plaintiffs do not provide any details about many of these topics, such as when they requested or were denied consultation. The Court can identify only one specific instance in which consultation was allegedly denied. That instance concerns the constitutional amendments and land assignment system at PIIC in 2016. *See* Pls.' Opp'n at 31 ("Once the MSIM representatives contacted the Department in 2016 requesting consultation regarding the PIIC constitutional amendments and the 30 acre land assignments at PIIC, the six year statute of limitations began."). The Court is unable to discern any other specific occasions on which Plaintiffs assert they were denied consultation, including any requests for consultation concerning the 12 square mile set-aside or Plaintiffs' eight other topics of possible dispute. The Court therefore considers only Plaintiffs' claim that they were denied consultation that they requested in 2016 about the constitutional amendments and land assignment system at PIIC. However, the Court's conclusion *infra* that Plaintiffs have failed to exhaust their administrative remedies would equally bar any other claims concerning denial of consultation because Plaintiffs do not assert that they have ever exhausted their administrative remedies.

In addition to their claim that they were denied consultation in 2016, portions of Plaintiffs' complaint leave open the possibility that Plaintiffs seek to assert—in this action—substantive claims under other statutes. *See, e.g.*, Compl. at 60 (seeking that the Court "[d]eclare that the Defendants have violated the statutory rights of the Plaintiffs . . . by failing to make future land assignments under the 1863 Act, 1888–1890 Appropriation Acts and 1980 Act; and by failing to provide possession of the twelve square miles of land awarded under the 1863 Act or legal equivalent"); Compl. at 61 (seeking that the Court "[i]ssue an injunction . . . requiring the Defendants to begin future land assignments under the 1863 Act, 1888–1890 Appropriation Acts and 1980 Act; and requiring Defendants to provide possession of the 12 square miles of land awarded in 1865 under the February 1863 Act or a legal equivalent"); Compl. ¶ 87 ("The Department, after Congressional revocation of the Prairie Island Indian Community corporate charter in 1996, must make land assignments to the MSIM."); Compl. ¶ 240 (arguing that because Defendants have violated "the 1863 Act, 1888–1890 Appropriation Acts, Indian Reorganization Act, 1980 Act and other statutes" their actions were "arbitrary, capricious, abuses of discretion, and not in accordance with the law" in APA terms); *see also* Compl. ¶ 173 (listing eight areas of possible legal dispute).

Upon consideration of Plaintiffs' complaint in its entirety, the Court concludes that Plaintiffs currently seek to challenge only the Defendants' refusal to consult under the APA, and describe for context their belief that such consultation would lead the Department to take other substantive actions, without the intent to raise those claims until the current action resolves their tribal status and whether Defendants must consult with them. *See* Compl. at 2 ("MSIM sues the United States to acknowledge MSIM's existence and to enjoin the United States from continuing arbitrary decisions without informing the MSIM . . . ."); Compl. ¶ 155 ("[T]he Department's

policies, practices and customs treating the MSIM as if it was not an acknowledged tribe is in legal error."). This conclusion is buttressed by Plaintiffs' explanations of their claims in their opposition to Defendants' motion to dismiss. *See, e.g.*, Pls.' Opp'n at 30, ECF No. 13 ("Defendant[s] commit[] legal error by not acknowledging the MSIM consistent with its administrative record. Once acknowledged, the MSIM may exercise rights under the 1934 IRA, the 1863 Act, the 1888–1890 Acts, and the 1980 Act."); Pls.' Opp'n at 34–35 ("MSIM's right as an acknowledged tribe under the 1934 IRA to consultation with the Department is being unlawfully withheld. . . . [T]he Complaint alleges that once the MSIM is acknowledged by the Department, it will exercise its rights under unrepealed statutes with current legal effect—namely the 1934 IRA, February 1863 Act, 1888–1890 appropriation acts and the 1980 Act."); Pls.' Opp'n at 36 ("Once the Department consults with the MSIM as an acknowledged tribe under the 1934 IRA, MSIM also complains of the Department's failure to provide them rights to the 1886 lands at the Prairie Island Indian Community . . ."); Pls.' Opp'n at 36 ("Once the Department consults with the MSIM as an acknowledged tribe under the 1934 IRA, MSIM also complains of the Department's failure to provide them rights to the 12 square miles of land.").

Indeed, in response to Defendants' argument that Plaintiffs failed to state a claim, Plaintiffs identify only a cause of action under the APA for failure to consult. *See, e.g.*, Pls.' Opp'n at 33–34 ("The APA provides a cause of action for MSIM to sue the government [for] refusing to consult with the MSIM as an acknowledged tribe under the 1934 IRA with powers to exercise rights under unrepealed statutes with current legal effect—IRA, February 1863 Act, 1888–1890 Appropriation Acts, etc.—including land rights and reservation boundaries based on statutory restrictions."); Pls.' Opp'n at 35–36 ("Now, the Plaintiffs complain of the Department of the Interior's 'policies, practices, and customs' of withholding the right of consultation from

the MSIM as an acknowledge [sic] tribe under the 1934 IRA. In this way, Plaintiffs challenge discrete agency action . . . ."). Throughout their opposition, Plaintiffs do not identify any statute other than the APA that provides a cause of action, or point to any alleged final agency action at issue other than the Department's various failures to consult. *See generally* Pls.' Opp'n at 33–37. The Court therefore concludes that Plaintiffs bring exclusively a claim under the APA for Defendants' failure to consult with them as a tribe, and, in particular, for failure to consult in 2016 regarding the proposed constitutional amendments and changes to the land assignment system at PIIC.[13] Therefore, the Court turns to Defendants' challenges in light of Plaintiffs' single claim.[14]

## A. Administrative Exhaustion

Defendants argue that summary judgment[15] is warranted because Plaintiffs did not exhaust their administrative remedies. Plaintiffs do not assert that they *have* exhausted their

---

[13] To the extent that Plaintiffs attempt to bring any other claims, those claims are dismissed. Any claim that the Plaintiffs challenge any final agency action other than the failure to consult has both been waived by Plaintiffs in their opposition, and cannot be discerned from Plaintiffs' complaint. *See Fletcher v. U.S. Dep't of Justice*, 17 F. Supp. 3d 89, 92 (D.D.C. 2014) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)) ("A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."). Any claim that Plaintiffs seek relief under a statute other than the APA is dismissed because Plaintiffs have not identified a cause of action. *Cf.* Defs.' MTD at 20–21.

[14] Because the Court agrees with Defendants that Plaintiffs have not exhausted their administrative remedies and grants Defendants summary judgment on that basis, the Court does not address Defendants' arguments that Plaintiffs are also precluded, Defs.' MTD at 21–25, or failed to join a necessary party, Defs.' MTD at 25–26.

[15] In order to reach the issue of administrative exhaustion, the Court converts Defendants' motion into one for summary judgment. *See Shane v. United States*, No. 07-577, 2008 WL 101739, at *7 (D.D.C. Jan. 9, 2008) ("[T]he appropriate procedural mechanism for bringing a case to closure when there is no evidence in the record that the plaintiff exhausted the administrative remedies available to him is a motion for summary judgment under Federal Rule of Civil Procedure 56, not a motion to dismiss under Rule 12."); *see also Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011) (noting that when the court refers to materials outside the

administrative remedies, but argue that they are excused from doing so because of the unreasonable delay, incapacity of the process, and bias in the Department. Pls.' Opp'n at 37–38. Because Plaintiffs have participated in neither the Department's administrative appeal process for the denial of consultation nor the Department's process to seek recognition as a tribe, the Court will grant Defendants summary judgment.[16]

"[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 158 (D.C. Cir. 2007) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)); *see also Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004) (holding that "failure to exhaust precludes judicial review if 'the purposes of exhaustion' and the 'particular administrative scheme' support such a bar" (citations omitted)). Defendants allege that Plaintiffs have failed to exhaust their remedies in two ways.

---

pleadings to resolve a 12(b)(6) motion, it must "convert the motion to dismiss into one for summary judgment").

Here, such conversion is appropriate. *See Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85–86 (D.D.C. 2012) (holding that a district court may exercise its discretion to convert a motion to dismiss into a motion for summary judgment when it would be "fair to both parties" (citations omitted)). In this case, Plaintiffs were on-notice after Defendants' motion to dismiss that the exhaustion of administrative remedies was at issue. *See* Defs.' MTD at 16–20, ECF No. 10. Plaintiffs addressed these concerns in part, but did not claim to have taken any steps toward using administrative remedies or cite any documents in their opposition. *See* Pls.' Opp'n at 37–40, ECF No. 13; *see also Munsell v. Dep't of Agric.*, 509 F.3d 572, 592 (D.C. Cir. 2007) (upholding district court's decision as a grant of summary judgment because the Defendants raised exhaustion in their motion to dismiss and the parties addressed it). The Court therefore converts Defendants' motion into one for summary judgment.

[16] As discussed *supra*, the Court interprets Plaintiffs' complaint to contain only a claim concerning the denial of consultation in 2016. However, any other occasions on which Plaintiffs believe they were denied consultation would also be subject to summary judgment for failure to exhaust for the same reasons, because Plaintiffs do not assert that they have ever made use of the administrative process.

First, the Department provides an administrative process, as described in 25 C.F.R. § 2.8, for appealing inaction by the Department. *See* Defs.' MTD at 16–17, ECF No. 10; *see also* 25 C.F.R. § 2.8 (describing processes for appeal from the "inaction" of an official by a person "whose interests are adversely affected" by the inaction). Plaintiffs could have used this administrative process to appeal the Department's alleged failure to consult them in 2016. Plaintiffs, however, do not claim that they have ever attempted to appeal through the Department's administrative process. This Court agrees with the determination of many courts in other jurisdictions that a failure to exhaust the appeal process of 25 C.F.R. § 2.8 prevents Plaintiffs from pursuing an APA claim. *See, e.g.*, *Jech v. Dep't of Interior*, 483 F. App'x 555, 560 (10th Cir. 2012); *Villegas v. United States*, 963 F. Supp. 2d 1145, 1157 (E.D. Wash. 2013); *Miranda v. Salazar*, No. 12-2216, 2013 WL 3367311, at *5–6 (C.D. Cal. July 3, 2013); *Casanova v. Norton*, No. 05-1273, 2006 WL 2683514, at *2 (D. Ariz. Sept. 18, 2006).

Second, Plaintiffs seek a right (consultation) that they claim is due because of their status as an Indian tribe. When other groups have sought relief that hinges upon their tribal status, the D.C. Circuit has required them to exhaust the Department's Part 83 process for tribal recognition before seeking a judicial determination of their tribal status. The Court finds that the same concerns require exhaustion of the Part 83 process here. The Part 83 process is the Department's formal avenue to recognize groups as Indian Tribes. *See* 25 C.F.R. Part 83; *see also James v. U.S. Dep't of Health & Human Servs.*, 824 F.2d 1132, 1136 (D.C. Cir. 1987) (stating that Part 83 lays out the process "allow[ing] any Indian group that is not currently acknowledged by the Department of the Interior to apply for federal recognition"). If a group is unsatisfied with the result of the Part 83 process, they may seek review before an ALJ, 25 C.F.R. § 83.38, and subsequently by the Assistant Secretary, *id.* § 83.40. The decision of the Assistant Secretary is a

final agency action for APA purposes, *id.* § 83.44, and therefore subject to judicial review. *See Mackinac Tribe v. Jewell*, 829 F.3d 754, 758 (D.C. Cir. 2016) ("[R]eview will be possible after the [plaintiffs] ha[ve] completed the Part 83 procedure."), *cert. denied*, 137 S. Ct. 638 (2017).

The D.C. Circuit has held that courts should require putative tribes to complete the Part 83 process before undertaking a judicial determination of their tribal status. *See id.* at 757 ("[W]hen a court is asked to decide whether a group claiming to be a currently recognized tribe is entitled to be treated as such, the court should for prudential reasons refrain from deciding that question until the Department has received and evaluated a petition under Part 83."); *see also James*, 824 F.2d at 1136 (holding that a Part 83 petition "is required as a prerequisite to acknowledgment"). This rule has been applied when the relief sought by the group asserting tribal status was the ability to conduct an election under the IRA, *Mackinac*, 859 F.3d 754, or inclusion on the Secretary's list of federally acknowledged tribes, *James*, 824 F.2d 1132. The Court sees no reason to depart from this rule in the current case where Plaintiffs seek the consultation-rights associated with tribal status.[17] Indeed, even when there was no requirement of administrative exhaustion because a plaintiff's claims were not brought under the APA, courts have deferred to the Department's initial determination of whether or not a group was a tribe because of the Department's superior expertise. *See, e.g.*, *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59–60 (2d Cir. 1994) (citing the Department's "structured administrative process to acknowledge 'nonrecognized' Indian tribes using uniform criteria, and

---

[17] Nor would Plaintiffs be excused from the Part 83 process if—as they assert—they had previously been recognized as a tribe but wrongfully terminated. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 218–19 (D.C. Cir. 2013) ("[T]he Part 83 process applies to a petition of a previously recognized tribe that seeks current recognition on that basis." (citing 25 C.F.R. § 83.8(a)); *see also Mackinac*, 749 F.3d at 757 ("[A] tribe seeking to be acknowledged by the Secretary must pursue the Part 83 process even if the tribe claims . . . that it has previously been recognized by the federal government." (citing *Muwekma*, 708 F.3d 218)).

its experience and expertise in applying these standards"). The Court therefore concludes that Plaintiffs here must complete the Part 83 process before the Court will adjudicate if the Department erred by denying them consultation.[18]

Plaintiffs tacitly concede that they have not exhausted either their internal appeals or the Part 83 process. Instead, Plaintiffs advance three reasons to excuse their failure.[19] "Courts have discretion to excuse the [exhaustion] requirement where the litigant's interest in an immediate judicial forum clearly outweighs the institutional interests underlying the exhaustion requirement. For example, exhaustion may be excused if delaying judicial review would cause irreparable injury, if the agency is not competent to address the issue or to grant effective relief, or if further pursuit of an administrative remedy would be futile." *Ass'n of Flight Attendants-CWA*, 493 F.3d at 159 (citations omitted). Contrary to Plaintiffs' contentions, none of these reasons applies here.

---

[18] The Court cautions that its conclusion here that Plaintiffs must complete the Part 83 process does *not* determine whether federal recognition is a prerequisite for the consultation Plaintiffs seek, because that issue is not squarely before the Court. *See Mackinac*, 829 F.3d at 757–58 (directing plaintiff to pursue tribal recognition through the Department despite the open "question [of] whether a group must be recognized to be eligible to organize under the IRA and whether that recognition must be marked by the group's appearance on the Secretary's list of federally recognized tribes").

[19] The exhaustion requirement of the APA is prudential, rather than jurisdictional. *See John Doe, Inc. v. DEA*, 484 F.3d 561, 565 (D.C. Cir. 2007) ("When judicial review is sought under the APA, for example, the requirement of 'final agency action' is not jurisdictional." (collecting citations)). Because the requirement is prudential, the Court will consider if any failure to exhaust by Plaintiffs may be excused. *Cf. Adamski v. McHugh*, No. 14-0094, 2015 WL 4624007, at *7 (D.D.C. July 31, 2015) ("The D.C. Circuit has made clear that, as far as prudential exhaustion is concerned, . . . . courts may . . . excuse the otherwise applicable exhaustion requirement 'if delaying judicial review would cause irreparable injury, if the agency is not competent to address the issue or to grant effective relief, or if further pursuit of an administrative remedy would be futile.'" (quoting *Ass'n of Flight Attendants–CWA v. Chao*, 493 F.3d 155, 159 (D.C. Cir. 2007))).

First, Plaintiffs argue that exhausting their administrative remedies would cause an excessive delay. Pls.' Opp'n at 38, ECF No. 13. However, they offer no support for their assertion that "any Department administrative procedure would likely stretch out for years." Pls.' Opp'n at 38. Plaintiffs do refer to the "many years" that the Defendants "spent . . . taking positions in the U.S. Court of Federal Claims against the MSIM," Pls.' Opp'n at 38—however, the length of a different lawsuit bears no necessary relation to the length of an administrative proceeding. Nor do they address the time required to complete the Department's internal appeal process versus the Part 83 procedure. Without any detailed explanation or support, the Court cannot credit their bare statements that the delay introduced by exhausting administrating remedies would render those remedies illusory. Nor do Plaintiffs explain why any delay would work an "irreparable harm" against them. Pls.' Opp'n at 38; *cf. Ass'n of Flight Attendants-CWA*, 493 F.3d at 159 ("[H]aving largely disregarded agency procedures the [plaintiffs] are in no position to complain of agency delay.").

Second, Plaintiffs attempt to argue that the Department lacks the capacity to recognize them as a tribe. Pls.' Opp'n at 38–39. However, the Court cannot agree with Plaintiffs' suggestion that the Department lacks "institutional competence" to resolve questions of the status of Indian tribes. *See* Pls.' Opp'n at 38. The Department has indisputable expertise in determining whether tribes meet the criteria for federal recognition, particularly through the Part 83 process. *See, e.g.*, *James*, 824 F.2d at 1138 (noting the Department's "expertise in the area of tribal recognition" including "two historians, two anthropologists, and two geneological [sic] researchers," which made it "apparent that the agency should be given the opportunity to apply its expertise prior to judicial involvement"); *N.J. Sand Hill Band of Lenape & Cherokee Indians v. Corzine*, No. 09-683, 2010 WL 2674565, at *9 (D.N.J. June 30, 2010) ("[W]eighty

considerations of institutional competence counsel this Court to defer to the BIA's historical, genealogical, and anthropological expertise before any adjudication on the merits would otherwise be appropriate." (collecting citations)).

Finally, Plaintiffs argue that they need not exhaust their administrative remedies because the Department is biased against them, and any attempt to exhaust would therefore be futile. Pls.' Opp'n at 39–40. As examples of the Department's alleged bias, Plaintiffs cite the Department's involvement against the MSIM plaintiffs in *Wolfchild*. Pls.' Opp'n at 39–40. Plaintiffs also reiterate their substantive allegations from the complaint that the Department "with[e]ld the right of consultation" and "mal-distribut[ed] $673,944 of MSIM trust funds." Pls.' Opp'n at 39–40. However, these examples demonstrate at most that the Department is not presently treating Plaintiffs as a tribe. They do not demonstrate that the Department has pre-determined Plaintiffs' tribal status were that question actually placed before them—especially given that Plaintiffs' application pursuant to the Part 83 process would be supported by record evidence. *Cf. Ass'n of Flight Attendants-CWA*, 493 F.3d at 159 ("We will excuse exhaustion on grounds of futility 'only when resort to administrative remedies is "clearly useless."'" (quoting *Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 157 (D.C. Cir. 2006))). The case cited by Plaintiffs, *Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489 (D.C. Cir. 1997), did not involve exhaustion at all, but rather whether the Department of the Interior could replace a tribe as a party for Rule 19 purposes. Because Plaintiffs have failed to show that their failure to exhaust administrative remedies should be waived, the Court will grant Defendants summary judgment based on

Plaintiffs' failure to exhaust their administrative remedies for the Department's alleged refusal to consult in 2016.[20]

## B. Statute of Limitations

Defendants have also asserted that Plaintiffs' claim falls beyond the applicable six-year statute of limitations set by 28 U.S.C. § 2401(a). Defs.' MTD at 11–13, ECF No. 10. The Court briefly addresses this argument because of the jurisdictional nature of the statute of limitations,[21] but, based on the evidence in the record, concludes that Plaintiff's claim concerning a denial of consultation regarding the PIIC constitutional amendments and land assignment in 2016 accrued no earlier than 2016, and therefore is not time-barred.

---

[20] Although it does not reach this issue, the Court notes some uncertainty concerning whether Plaintiffs must exhaust both the Part 83 process and the § 2.8 process. If, as appears likely from the Court's research, federal recognition as a tribe is a prerequisite for the consultation that Plaintiffs seek, then Plaintiffs would likely be required to exhaust the Part 83 process for the reasons described previously. If that process concludes against Plaintiffs, the Court suspects that Plaintiffs could proceed to challenge that determination as a final agency action without pursuing the § 2.8 process, which would then likely be futile.

[21] The Court follows the explicit holding of the D.C. Circuit that "section 2401(a) creates 'a jurisdictional condition attached to the government's waiver of sovereign immunity.'" *Hardin v. Jackson*, 625 F.3d 739, 740 n.1 (D.C. Cir. 2010) (quoting *P & V Enters. v. U.S. Army Corps of Eng'rs.*, 516 F.3d 1021 (D.C. Cir. 2008)). As Plaintiffs note, Pls.' Opp'n at 24–26, the Supreme Court in *Kwai Fun Wong* recently concluded that the Federal Tort Claims Act's statute of limitations, codified at 28 U.S.C. § 2401(b), was not jurisdictional. *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1633 (2015) ("Section 2401(b) is not a jurisdictional requirement. The time limits in the FTCA are just time limits, nothing more. Even though they govern litigation against the Government, a court can toll them on equitable grounds.").
  However, because the D.C. Circuit has not yet addressed the application of *Kwai Fun Wong* to § 2401(a), this Court continues to follow the D.C. Circuit's prior conclusion until the D.C. Circuit addresses it in the first instance. *See, e.g.*, *Horvath v. Dodaro*, 160 F. Supp. 3d 32, 43 n.9 (D.D.C. 2015) ("Nonetheless, because the D.C. Circuit Court of Appeals has explicitly held that section 2401(a) is jurisdictional, *see Spannaus*, 824 F.2d at 52, and because the Supreme Court's holding in *Wong* is limited to the section 2401(b), Circuit precedent remains binding on this Court[.]"); *see also, e.g.*, *Huffman v. Kelly*, No. 16-861, 2017 WL 932949, at *5 (D.D.C. Mar. 8, 2017); *In re Chaplaincy*, No. 1:07-269, 2016 WL 541126, at *3 (D.D.C. Feb. 9, 2016).

Here, the general six year standard of limitations for suits against the United States applies. *Harris v. FAA*, 353 F.3d 1006, 1009–10 (D.C. Cir. 2004) (citing 28 U.S.C. § 2401(a) and *Sendra Corp. v. Magaw*, 111 F.3d 162, 165 (D.C. Cir. 1997))). As discussed previously, the Court recognizes only a claim by Plaintiffs that Defendants failed to consult with them as a tribe. Given the facts alleged before this Court—namely, that Plaintiffs requested consultation in 2016 concerning the proposed amendments to the PIIC constitution and land assignment system, but were denied—Plaintiffs' claim that they were denied consultation in 2016 accrued no earlier than 2016, and is therefore well within the six-year period. *See* Pls.' Opp'n at 31 ("Once the MSIM representatives contacted the Department in 2016 requesting consultation regarding the PIIC constitutional amendments and the 30 acre land assignments at PIIC, the six year statute of limitations began.").

Defendants' suggestion that the statute of limitations closed long ago because of one or more of the decades-old events contained in Plaintiffs' lengthy historical account, Defs.' MTD at 11–13, ECF No. 10, is not persuasive in light of the narrow claim for consultation in 2016 identified by this Court. Defendants also argue that the statute of limitations would have begun to run in 1979, when the list of federally recognized tribes was first published, because Plaintiffs were then on notice that the Department did not recognize them. Defs.' MTD at 12 n.13. However, the Court lacks adequate information in the record to reach this question squarely. Defendants have not presented evidence demonstrating that inclusion on the list of federally recognized tribes is congruent with a tribe's right to be consulted. Nor have Defendants shown that Plaintiffs were ever informed that their requests for consultation—whether the 2016 request or other requests—were denied because they did not appear on the list of federally recognized tribes. In the absence of evidence on these points, the Court declines to dismiss Plaintiffs' claims

on statute of limitations grounds. *See McConnell v. Air Line Pilots' Ass'n, Int'l*, No. 08-1600, 2009 WL 765884, at *1 (D.D.C. Mar. 23, 2009) ("Courts are hesitant to grant a motion to dismiss based on the statute of limitations unless the facts that give rise to the defense are clear on the face of the complaint." (citing *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 577–78 (D.C. Cir. 1998))); *see also Johnson v. Long Beach Mortg. Loan Tr. 2001-4*, 451 F. Supp. 2d 16, 49 (D.D.C. 2006) ("Because, however, this Court cannot determine as a matter of law when Plaintiff's D.C. claims accrued, . . . Defendants' Motions to Dismiss [on statute of limitations grounds] shall be denied."); *Nwachukwu v. Karl*, 223 F. Supp. 2d 60, 70 (D.D.C. 2002) ("The plaintiff does not reference the date that the defendant terminated his legal relationship with the plaintiff. . . . Thus, at this time, it is unclear whether the plaintiff's causes of action are time-barred and fit for dismissal. Accordingly, the court denies the defendant's motion to dismiss."). Of course, the Court takes no position regarding the application of the statute of limitations to any potential claims other than the single claim it has identified here, including any potential claims by Plaintiffs that they were denied consultation on any other subject (whether in 2016 or at another time).

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 10), construed as a motion for summary judgment, is **GRANTED** and Federal Defendants' Request for Judicial Notice (ECF No. 11) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 1, 2017                                  RUDOLPH CONTRERAS
                                                          United States District Judge